*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0357p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEVIN J. RABBERS,

        *Plaintiff-Appellant,*

    *v.*

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

        *Defendant-Appellee.*

No. 08-2317

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00845—Richard A. Enslen, District Judge.

Submitted: April 22, 2009

Decided and Filed: October 5, 2009

Before: CLAY and McKEAGUE, Circuit Judges; HOLSCHUH, Senior District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Frederick W. Bleakley, BLEAKLEY LAW OFFICES, P.C., Muskegon, Michigan, for Appellant. Charles R. Goldstein, SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE GENERAL COUNSEL, Chicago, Illinois, for Appellee.

    McKEAGUE, J., delivered the opinion of the court, in which CLAY, J., joined. HOLSCHUH, D. J. (pp. 22-35), delivered a separate opinion dissenting in part and concurring in part.

---

    [*]The Honorable John D. Holschuh, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  In this appeal, Plaintiff-Appellant Kevin Rabbers ("Rabbers") challenges the district court's decision affirming the denial of his application for disability insurance benefits by Defendant-Appellee Commissioner of Social Security ("Commissioner").  Rabbers argues that the Administrative Law Judge ("ALJ") failed to make specific findings regarding the severity of his mental impairment—bipolar disorder—as required by the regulations.  He also argues that the ALJ improperly rejected the opinion of his treating source, Dr. Bobga Fomunung, in determining that his bipolar disorder did not meet the criteria of a listed impairment.

The ALJ clearly did not make the required findings regarding the severity of Rabbers's mental impairment.  We conclude, however, that this error was harmless.  It did not deprive Rabbers of a substantial procedural right.  Nor did it prejudice him on the merits, as the administrative record indicates that his bipolar disorder was not severe enough to render him disabled.   In fact, the ALJ properly rejected the only evidence in the record that would have supported a contrary conclusion:  the opinion of Dr. Fomunung.  We therefore affirm the decision of the district court.

**I.**

Rabbers was born on July 10, 1961.  He is a high school graduate who has completed two years of college.  Among other occupations, Rabbers has previously been employed as a welder, machine fabricator, maintenance supervisor, machine operator, and autobody technician.

In July 2003, apparently due to work stress, Rabbers sought outpatient counseling at  Holland Community Hospital Outpatient Behavioral Health Services Clinic (the "Holland Clinic") in Holland, Michigan.   He met regularly with a psychiatrist, who prescribed Paxil, as well as a social worker.

By June 2004, Rabbers had recently lost his job, had been arrested for drunk driving, and was in the midst of a divorce from his wife of twelve years. On June 13, 2004, he was voluntarily admitted to Allegan General Hospital in Allegan, Michigan, because he was apparently acting "emotionally erratic" and threatening to kill his wife and two children. Upon admission to the hospital, he tested positive for marijuana and had a blood alcohol level of .16. Dr. Mary Kirkwood diagnosed Rabbers with bipolar disorder with mixed features and a history of alcohol abuse. She prescribed Depakote and Seroquel for mood stabilization and paranoia. After eight days in the hospital, Rabbers was discharged to jail.

Following his discharge from the hospital and release from jail, Rabbers stopped taking his medication because he believed it was causing him to experience abdominal pain. He was voluntarily admitted to Allegan General Hospital a second time on July 7, 2004. Upon admission, he tested positive for marijuana. Dr. Kirkwood again diagnosed Rabbers with bipolar disorder with mixed features and a history of alcohol abuse and prescribed Depakote and Seroquel. Rabbers was discharged from the hospital after a ten-day stay.

After his second hospitalization, Rabbers continued his outpatient treatment at the Holland Clinic through July 2006. During his visits there, Rabbers was asked to rate his symptoms on a scale of 1-5 (with "1=very bad" and "5=no problem").[1] Most of the time, Rabbers rated all of his symptoms as a 4 or 5; only twice, in March and September 2005, did he rate some of his symptoms below a 4. Also during this time period, Rabbers consistently reported that he was taking his medication and did not report any side effects. Sometime around the fall of 2005, Rabbers began receiving his outpatient treatment at the Holland Clinic from Dr. Bobga Fomunung.[2] The record indicates that

---

[1] These symptoms included anxiety, depression, crying episodes, panic attacks, social withdrawal, appetite, weight gain/loss, memory, concentration, decision making, ability to enjoy, energy level, motivation, interest, irritability, suicidal thoughts, suicidal plans, suicidal behavior, and feeling hopeless/worthless.

[2] On September 22, 2006, Dr. Fomunung provided a sworn statement indicating that he had been treating Rabbers for "[a]bout a year now, a year and a couple months." As the magistrate judge's report and recommendation points out, however, the record does not clearly identify Dr. Fomunung as Rabbers's care provider. But it does contain six pages of treatment notes taken during the alleged time period of Dr.

Rabbers met with Dr. Fomunung approximately once every two to three months, for a total of six visits, with each visit lasting between fifteen and thirty minutes.

On September 28, 2004, Rabbers filed an application for disability insurance benefits with the Social Security Administration ("SSA"), alleging onset of his disability on January 21, 2004. He claimed that he was unable to engage in any substantial gainful activity due to his bipolar disorder.

On November 19, 2004, psychologist Dennis L. Mulder conducted a consultative evaluation for the Michigan Disability Determination Service. According to Dr. Mulder's report, Rabbers would usually perform household chores in the morning, visit a soup kitchen in the afternoon, and attend a support group in the evening. Dr. Mulder also noted that Rabbers "complain[ed] of . . . episodes of depression and mania . . ., but he states that this has improved with his use of medication and therapy." Dr. Mulder diagnosed Rabbers with bipolar disorder "improving with treatment," and "[h]istory of alcohol abuse in short-term remission." He ultimately concluded that the potential for Rabbers to become gainfully employed in simple, unskilled work was fair, "pending his continued compliance with psychiatric treatment and substance abuse treatment."

On January 21, 2005, Dr. William Schirado completed a Psychiatric Review Technique Form ("PRTF") addressing Rabbers's mental impairment. Determining that Rabbers suffered from bipolar disorder and persistent disturbances of mood or affect, Dr. Schirado concluded that Rabbers satisfied the Part A criteria for sections 12.04 (Affective Disorders) and 12.08 (Personality Disorders) of the Listing of Impairments.[3] However, Dr. Schirado determined that Rabbers failed to satisfy the Part B criteria of these listings. Specifically, he determined that Rabbers had moderate restriction of his activities of daily living, moderate difficulties in maintaining social functioning,

---

Fomunung's treatment. Although the signature on these notes is illegible, we, like the magistrate judge, assume that they were authored by Dr. Fomunung.

[3]Dr. Schirado also concluded that Rabbers's impairment fell under section 12.09 (Substance Addiction Disorders) of the Listing of Impairments. The severity of a substance addiction disorder under section 12.09, however, is evaluated under the requirements of other applicable sections of the Listing of Impairments. In this case, the applicable section was section 12.08 (Personality Disorders). For this reason, we will discuss the severity of Rabbers's mental impairment only under sections 12.04 and 12.08.

moderate difficulties in maintaining concentration, persistence, or pace, and only one or two episodes of decompensation. Dr. Schirado also completed a Mental Residual Functional Capacity Assessment Form rating Rabbers's limitations in twenty categories involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Schirado found that Rabbers was moderately limited in only six of these categories. With respect to the remaining fourteen categories, Dr. Schirado concluded that Rabbers was either not significantly limited or that there was no evidence of limitation.

On January 28, 2005, the Commissioner denied Rabbers's application for disability insurance benefits. Rabbers filed a timely request for a hearing before an ALJ. He appeared before an ALJ with counsel on March 23, 2007. At the hearing, Rabbers testified that he still had "crying episodes and mania" and was prone to agitation, irritability, and anger, but he admitted that these symptoms had decreased as a result of his medications. However, he testified that his medication "makes it kind of hard to get up in the morning and stay focused and stay awake." He did not believe he would be able to work at a full-time job because he "would have a hard time with attendance, staying awake." According to Rabbers, he would not be able to go to work approximately fifteen out of every thirty days because of the side effects of his medication. Rabbers's attorney also referred the ALJ to Dr. Fomunung's sworn statement, in which Dr. Fomunung testified that the side effects of Rabbers's medications "really affect[ ] his ability to function, the sedation in particular, makes him very tired, very exhausted, very groggy, and so he's not able to function."

In addition to Rabbers's own testimony, the ALJ heard testimony from a medical expert, Dr. Kathleen O'Brien, and a vocational expert, Lee Knudsen. Dr. O'Brien testified that Rabbers's outpatient records did not "substantiate the severity of symptoms, either as they are reported by [Rabbers] or in the sworn statement of [Dr. Fomunung]," and that in fact there was "a progressive improvement in [Rabbers's] report to his treatment providers." Dr. O'Brien also testified that any use of alcohol or drugs by Rabbers "would eliminate the ability of the meds to do their job" and "would account

for the amount of sedation that he's experiencing."  After hearing Dr. O'Brien's testimony, the ALJ posed two hypothetical questions to Knudsen.  If the ALJ found that Rabbers was capable of simple, unskilled work, Knudsen testified that there were a significant number of jobs available to him in the Grand Rapids-Muskegon-Holland combined statistical area.[4]  If the ALJ found that Rabbers's testimony was credible, however, Knudsen testified that Rabbers "would not be able to sustain or keep employment" because he would "have trouble with attendance" and "difficulty in accepting criticism or supervision."

In a written decision dated April 16, 2007, the ALJ found that Rabbers was not disabled and denied his application for disability insurance benefits.  The Social Security Appeals Council denied Rabbers's request for review, rendering the ALJ's decision the final decision of the Commissioner.  Pursuant to 42 U.S.C. § 405(g), Rabbers sought judicial review of the Commissioner's decision in the United States District Court for the Western District of Michigan.  The case was referred to a magistrate judge, who recommended affirmance. *See Rabbers v. Comm'r of Soc. Sec.*, No. 1:07-CV-845, 2008 WL 4151350, at \*2 (W.D. Mich. Sept. 4, 2008).  Over Rabbers's objections, the district court adopted the magistrate judge's recommendation and affirmed the Commissioner's decision. *Id.* at \*1-2.  Rabbers filed a timely notice of appeal with this court.

## II.

We review a district court's decision in social security cases *de novo*. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005).  We must affirm the Commissioner's decision if it "is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see also* 42 U.S.C. § 405(g).  Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d

---

[4]Knudsen testified that Rabbers could perform at least 13,500 jobs at the medium level of exertion, 6,000 jobs at the light level of exertion, and 1,980 jobs at the sedentary level of exertion.

742, 746 (6th Cir. 2007); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

**A.**

To be entitled to disability insurance benefits, an individual must be under a disability within the meaning of the Social Security Act.[5] 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The SSA has established a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a). If the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step. *Id.* The five steps are as follows:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Id.* §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th

---

[5]The individual also must be insured for disability insurance benefits, have not attained retirement age, and have filed an application for benefits. 42 U.S.C. § 423(a)(1). The Commissioner does not contend that Rabbers failed to satisfy any of these requirements.

Cir. 1997). The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Here, the ALJ applied the governing five-step analysis and determined that Rabbers was not disabled. At step one, the ALJ found that Rabbers had not engaged in any substantial gainful activity since January 21, 2004. At step two, the ALJ concluded that Rabbers's diagnosed bipolar disorder constituted a severe medically determinable mental impairment. He found at step three that Rabbers's bipolar disorder did not meet or medically equal an impairment listed in Appendix 1 to Subpart P of the regulations. At that point, the ALJ concluded that Rabbers possessed the residual functioning capacity ("RFC") to perform simple, unskilled work. Moving to step four, the ALJ concluded that Rabbers was unable to perform his past relevant work. However, at step five, the ALJ found that Rabbers was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Based upon this last finding, the ALJ found that Rabbers was not disabled within the meaning of the Social Security Act.

**B.**

On appeal, Rabbers argues that the ALJ failed to make specific findings regarding the severity of his mental impairment, which is required at steps two and three of the five-step framework. The regulations provide a "special technique" for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. § 404.1520a(a). This special technique must be followed at each level in the administrative review process. *Id.*

At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Id.* § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or

pace; and episodes of decompensation." *Id.* §§ 404.1520a(b)(2), (c)(3). These four functional areas are commonly known as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.*; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* § 404.1520a(d)(1). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *See id.* § 404.1520a(d)(2).

At step three, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." *Id.* § 404.1525(a). In other words, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* § 404.1525(c)(3). A claimant must satisfy all of the criteria to meet the listing. *Id.* Under section 12.04 (Affective Disorders), for example, the so-called A criteria are satisfied by medical documentation of bipolar syndrome with a history of episodic periods. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. Evidence of persistent disturbances of mood or affect is sufficient to satisfy the A criteria of the other relevant listing in this case, section 12.08 (Personality Disorders). The B criteria of both listings are satisfied by a showing of at least two of the following functional limitations: 1) a marked restriction of activities of daily living, 2) marked difficulties in maintaining social functioning, 3) marked difficulties in maintaining concentration, persistence, or

pace, or 4) repeated episodes of decompensation, each of extended duration.**6** *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC and move on to steps four and five. 20 C.F.R. § 404.1520a(d)(3).

Importantly, the regulations require an ALJ to document the application of this special technique in the written decision. *Id.* § 404.1520a(e). Until 2000, an ALJ was required to complete a PRTF and append the form to the decision. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746 (Aug. 21, 2000). Now, the regulations require only an ALJ's written decision to "incorporate the pertinent findings and conclusions based on the technique." 20 C.F.R. § 404.1520a(e)(2). The decision must refer to the "significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id.* The decision must also "include a specific finding as to the degree of limitation in each of the functional areas." *Id.* At step three, the ALJ's decision must "record the presence or absence of the criteria [of the listing] and the rating of the degree of functional limitation." *Id.* § 404.1520a(d)(2).

Here, as discussed above, the ALJ concluded that Rabbers's bipolar disorder constituted a severe impairment at step two, but concluded at step three that the impairment did not meet or medically equal one of the listed impairments. At neither step, however, did the ALJ make specific findings regarding Rabbers's degree of limitation in each of the four functional areas, or B criteria. Rather, he cited Dr. O'Brien's testimony that Rabbers's symptoms met the A criteria of section 12.04 of the Listing of Impairments, but ultimately did not satisfy the listing because they were

---

**6**Even if a claimant does not meet the B criteria, he or she will still satisfy section 12.04 if he or she meets the C criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. Rabbers, however, does not raise the C criteria as an alternative basis for his argument that he satisfies section 12.04; as such, the C criteria are not applicable in this case.

"mild" or "nonexistent" and "nonsevere."**7**   The ALJ also referred to Dr. O'Brien's opinion that "symptoms and the impairment are considered as severe if the person is unable to function on a daily basis, and if so, such a person would need to see a doctor or counselor more than once every three months."

The Commissioner concedes that the ALJ erred by neglecting to make specific B criteria findings as required under under § 404.1520a(e)(2).   Notwithstanding the ALJ's procedural error, however, the Commissioner urges us to affirm.   Had the ALJ made the required findings, the Commissioner argues, he still would have concluded at step three that Rabbers's symptoms were not of listing-level severity, and therefore the error was harmless.

### III.

We have recognized that "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations."   *Wilson*, 378 F.3d at 545; *see also* 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").   Generally, however, we review decisions of administrative agencies for harmless error.   *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality").   Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."   *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539

---

**7**The ALJ's decision seems to have overlooked the applicability of section 12.08.   Because the B criteria for section 12.04 and section 12.08 are identical, however, the ALJ's oversight is not particularly relevant to our resolution of this case.

(1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).

But in what circumstances, if any, can an agency's noncompliance with a procedural regulation such as § 404.1520a be deemed harmless? We are aware of only one prior decision in which this circuit has addressed the issue. In an unpublished decision, this court held that an ALJ's failure to attach a PRTF to the written opinion, as required by the prior regulations, amounted to harmless error. *Thornsberry v. Comm'r of Soc. Sec.*, 37 F. App'x 749, 751 (6th Cir. 2002). According to the court, the ALJ's opinion "contained an extensive analysis of [the claimant's] mental impairments, which provide[d] the essential information that would have been contained on a PRTF," and the claimant "[had] not shown how he was prejudiced by the ALJ's failure to attach a separate form." *Id.*

Other circuits, however, have been inclined to reverse and remand in cases where an ALJ failed to follow the special procedure of § 404.1520a. Some of these circuits have left open the possibility that noncompliance with § 404.1520a can be harmless in certain circumstances. *See Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (noting that "an ALJ's failure to adhere to the regulations' special technique might under other facts be harmless"); *Craft*, 539 F.3d at 675 ("Under some circumstances, the failure to explicitly use the special technique may indeed be harmless error."); *see also Montgomery v. Shalala*, 30 F.3d 98, 100 (8th Cir. 1994) (remanding after concluding that ALJ's error of failing to complete PRTF under prior regulations was not harmless). Other circuits have appeared to adopt a *per se* rule requiring remand in any case where an ALJ has failed to follow § 404.1520a and where the claimant has presented at least a colorable claim of mental impairment. *See Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005); *Shivel v. Astrue*, 260 F. App'x 88, 91 (10th Cir. 2008); *Selassie v. Barnhart*, 203 F. App'x 174, 176 (9th Cir. 2006); *see also Gutierrez v. Apfel*, 199 F.3d 1048, 1051 (9th Cir. 2000) (remanding for failure to comply with prior regulations); *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991) (same).

Because we are neither bound by this court's decision in *Thornsberry*, *see* 6TH CIR. R. 206(c); *Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007), nor the decisions of our sister circuits, *see Bowling Green v. Martin Land Dev. Co., Inc.*, 561 F.3d 556, 560 (6th Cir. 2009), we consider these cases for their persuasive effect, if any, but undertake an independent review of the arguments made in this case.

**A.**

Rabbers first argues that the ALJ's failure to rate the B criteria was not harmless because it deprived him of a substantial procedural right. He argues, in other words, that he was entitled to the procedure of § 404.1520a itself. At least one circuit—the Ninth—appears to have embraced a similar concept. *See Selassie*, 203 F. App'x at 176 (stating that the requirements of § 404.1520a "are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements").

As support for his argument, Rabbers cites to this court's decision in *Wilson v. Commissioner of Social Security*. In *Wilson*, this court held that an ALJ's failure to give "good reasons" for not crediting the opinion of a treating physician, as required by 20 C.F.R. § 404.1527(d)(2), was not harmless and would almost always require reversal and remand to the Commissioner. 378 F.3d at 546. In reaching its decision, the court distinguished between "regulations 'intended primarily to confer important procedural benefits upon individuals' and regulations 'adopted for the orderly transaction of business before [the agency].'" *Id.* at 547 (quoting *Am. Farm Lines*, 397 U.S. at 538-39) (alteration in original). In the former case, the regulation confers a substantial procedural right; in the latter, it does not. *Id.* Because the *Wilson* court concluded that the reasons-giving requirement of § 404.1527(d)(2) "creat[es] an important procedural safeguard for claimants for disability benefits," the court could "not excuse the denial of [such] a mandatory procedural protection simply because . . . there [was] sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand [was] unlikely." *Id.* As a result, the ALJ's failure to follow the regulation was not harmless. However, the *Wilson* court stopped short of

holding that a failure to give good reasons for rejecting a treating source's opinion could *never* be harmless. In fact, it explicitly did not "decide the question of whether a *de minimis* violation may qualify as harmless error."[8] *Id.*

*Wilson*'s circumscribed form of harmless error review has not been applied outside the context of the reasons-giving requirement of § 404.1527(d)(2), and we decline the invitation to extend it to this case. The treating physician rule occupies a special place in social security cases; indeed, treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). Because the opinion of the treating physician plays such a central and important role in a claimant's application for social security benefits, the reasons-giving requirement of § 404.1527(d)(2) serves its own independent and important function: as a safeguard to "ensure[ ] that the ALJ applies the treating physician rule." *Wilson*, 378 F.3d at 544. We are unable to conclude that the same rationale applies in the context of an ALJ's failure to rate the B criteria.

Rather, the requirement that an ALJ assign a score to each of the B criteria strikes us more as an "adjudicatory tool" designed to aid the SSA in determining the severity of a claimant's mental impairment, *Clark v. Sullivan*, No. 92-1030, 1992 WL 296709, at *4 (6th Cir. Oct. 19, 1992) (per curiam) (describing the PRTF as an "adjudicatory tool")—in other words, a regulation "'adopted for the orderly transaction of business'" before the SSA—as opposed to a regulation "'intended primarily to confer important procedural benefits upon'" claimants, *Wilson*, 378 F.3d at 547 (quoting *Am. Farm Lines*, 397 U.S. at 538-39). The regulation itself provides that "[u]sing the [special] technique helps *us*: (1) Identify the need for additional evidence to determine impairment severity;

---

[8] For example, the court continued, a treating source's opinion could be "so patently deficient that the Commissioner could not possibly credit it," the Commissioner might essentially adopt the opinion of the treating source without explicitly doing so, or the Commissioner might "[meet] the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.*

(2) Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and (3) Organize and present our findings in a clear, concise, and consistent manner." 20 C.F.R. § 404.1520a(a) (emphasis added). Interestingly, this language is worded in terms of the procedure's benefit to the SSA, not the claimant.

Another important purpose of the treating physician rule, as the *Wilson* court noted, is to ensure that a claimant understands the disposition of his or her case, "particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not.'" *Wilson*, 378 F.3d at 545 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). In such cases, the claimant is entitled to an explanation as to why the agency is rejecting the treating physician's opinion. But as the Commissioner points out, this special concern is absent in the context of § 404.1520a, where the ALJ's procedural violation is neither as strong nor as personal: a claimant would not be so "especially bewildered" or offended if an ALJ did not explicitly rate the B criteria before concluding that the claimant's mental impairment was not severe enough to satisfy any of the listings.

Finally, it is much easier for a reviewing court to determine whether an error under § 404.1520a is harmless. The *Wilson* court noted that the reasons-giving requirement of § 404.1527(d)(2) "permits meaningful review of the ALJ's application of the [treating physician] rule." *Wilson*, 378 F.3d at 544. If an ALJ rejects a treating physician's opinion but gives no reasons for doing so, it is difficult for a reviewing court to conduct its own analysis and make a judgment as to what the ALJ's reasons would have been—unless, as the *Wilson* court recognized, the treating physician's opinion is "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. Faced with an ALJ's failure to address the B criteria, however, a reviewing court need only ask whether the record indicates that the claimant's mental impairment would have ultimately satisfied the B criteria. This kind of evidence—evidence regarding the claimant's activities of daily living, social functioning, concentration,

persistence, or pace, and episodes of decompensation—is objective, concrete factual and medical evidence that will be apparent in the record, at least in some cases.

For these reasons, we hold that the special technique of § 404.1520a does not confer such an "important procedural safeguard" upon claimants that an ALJ's failure to rate the B criteria will rarely be harmless. *Wilson*, 378 F.3d at 547. Rabbers's argument that the error was not harmless because he was "deprived of substantial rights" therefore fails. *Connor*, 721 F.2d at 1056.

**B.**

Rabbers's next argument is essentially that the ALJ's failure to rate the B criteria prejudiced him on the merits by making it impossible to conduct adequate review of the ALJ's decision. Some circuits apparently have embraced this concept as well. *See, e.g.*, *Kohler*, 546 F.3d at 269 ("[T]he record in this case does not allow us to say that the ALJ's failure here was harmless."); *Craft*, 539 F.3d at 675 ("We cannot conclude that [the error] was harmless here because . . . . the ALJ gave short shrift to potential limitations caused by [the claimant's] mental impairments . . . ."); *Moore*, 405 F.3d at 1214 ("Because the ALJ's decision lacks consideration of these factors . . . we cannot even evaluate the Commissioner's contention that the ALJ's error was harmless.").

We agree that in some cases it may be difficult, or even impossible, to assess whether an ALJ's failure to rate the B criteria was harmless. In such cases, the record may contain conflicting or inconclusive evidence relating to the B criteria. Or it may contain evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider. As a result, courts generally should exercise caution in conducting harmless error review in this context. In this case, though, we are satisfied from our review of the record that the ALJ's failure to rate the B criteria was indeed harmless.

First, the ALJ's failure to rate the B criteria at step two of the five-step analysis was clearly harmless. Notwithstanding this error, the ALJ ultimately concluded that Rabbers had a severe mental impairment and proceeded to step three, which was all Rabbers could have asked for. *Cf. Wilson,* 378 F.3d at 547 (stating that failure to explain

weight given to treating physician's opinion may be harmless if Commissioner ultimately makes findings consistent with that opinion).

Second, even had the ALJ made specific findings regarding the B criteria, he would have reached the same conclusion at step three: that Rabbers's bipolar disorder was not sufficiently severe to meet the criteria of any listed impairment. As previously discussed, the B criteria of the relevant listings in this case are satisfied by a showing of at least two of the following functional limitations: 1) a marked restriction of activities of daily living, 2) marked difficulties in maintaining social functioning, 3) marked difficulties in maintaining concentration, persistence, or pace, or 4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. "A marked limitation may arise where several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*; *see also* 20 C.F.R. § 404.1520a(c)(1).

As to the first of the four B criteria, the record clearly indicates that Rabbers did not have a marked restriction in his activities of daily living. Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1). Although the ALJ did not make a specific finding regarding Rabbers's degree of limitation in this functional area, his written decision did refer in detail to the findings of Dr. Mulder's consultative evaluation:

> The claimant described his activities of daily living as waking up at 9:00 am, doing household chores and watching television in the morning. In the afternoon, he will visit a soup kitchen and watch television. He does chores, attends NA [Narcotics Anonymous] or AA [Alcoholics Anonymous] meetings, or watches television in the evening and goes to bed at 10:00 pm.

Dr. Mulder's report also indicated that Rabbers did "some of the vacuuming, dusting, cooking, dishes, and laundry" and that he "mow[ed] the lawn and rake[d] the yard." Moreover, the ALJ referred to Rabbers's medical records, which indicated that his symptoms were "either not a problem or mild with no side effects from medication." He also cited Dr. O'Brien's testimony for the proposition that a person who was unable to function on a daily basis "would need to see a doctor or counselor more than once every three months." Even Dr. Fomunung, Rabbers's treating source, testified that the restriction in Rabbers's activities of daily living "would be perhaps mild." Although the PRTF completed by Dr. Schirado was more favorable to Rabbers—rating the restriction on his activities of daily living as "moderate"—it is still insufficient to show that Rabbers suffered a marked restriction. The record therefore clearly shows that Rabbers's bipolar disorder did not seriously interfere with his ability to function on a daily basis.

Regarding the second of the four functional areas, the record does not indicate that Rabbers had marked difficulties in maintaining social functioning. Social functioning involves a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2). The ALJ acknowledged Rabbers's testimony at the administrative hearing that he "has anger management problems and is not much of a people person, but he is better around machines." The record indicates, however, that Rabbers almost always rated his symptoms of "social withdrawal" as a 4 or a 5 on his self-assessment forms. According to Dr. Mulder's report, Rabbers got along well with most of his family, including his father, mother, brother, ex-wife, and children. He also apparently had six to ten close friends outside of his family. In addition, the PRTF completed by Dr. Schirado indicates only moderate, not marked, difficulties in maintaining social functioning. The ALJ spefically cited Dr. Schirado's conclusions that Rabbers was moderately limited in his ability to "interact appropriately with the general public" and to "accept instructions or criticism from supervisors." On top of that, Dr. Schirado also concluded that Rabbers was not significantly limited in the ability to ask simple questions or request assistance, get along with coworkers or peers, or maintain socially appropriate behavior. Thus, although the evidence suggests that

Rabbers sometimes found it difficult to get along with others, it does not show that his bipolar disorder seriously interfered with his ability to maintain social functioning.

As to the third functional area—maintaining concentration, persistence, or pace—there is no evidence that Rabbers suffered marked difficulties. This area involves "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3). On his self-assessment forms, Rabbers almost always rated his concentration as a 5. Only a few times did he rate it as a 4, and only once as a 3. Further, Dr. Schirado concluded that Rabbers had only moderate difficulties in maintaining concentration, persistence, or pace. The ALJ specifically referred to Dr. Schirado's finding that Rabbers was moderately limited in his ability to "understand, remember, or carry out detailed instructions" and to "work in coordination or proximity to others without being distracted." Accordingly, the evidence indicates that Rabbers did not have marked difficulties in maintaining his concentration, persistence, and pace as a result of his bipolar disorder.

Finally, with respect to the last of the four functional areas, the record shows that Rabbers experienced only one or two episodes of decompensation. Episodes of decompensation "are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistance, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). They "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* "The term *repeated episodes of decompensation, each of extended duration* . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* Here, Rabbers's two visits to the hospital in June and July of 2004 are the only episodes of decompensation in the record. At the hearing, Dr. O'Brien referred to "a period of decompensation where [Rabbers] was hospitalized on two occasions between June, once in June and once in July of 2004." On the PRTF,

Dr. Schirado also concluded that Rabbers had suffered from only one or two episodes of decompensation. Thus, the record shows that Rabbers did not suffer from repeated episodes of decompensation, each of extended duration.

In fact, the only medical evidence in the record that would have even arguably supported a finding that Rabbers met the B criteria is the testimony of Rabbers's treating source, Dr. Fomunung.[9] Dr. Fomunung testified that "the side effects of the medication really affects [Rabbers's] ability to function, the sedation in particular, makes him very tired, very exhausted, very groggy, and so he's not able to function." Dr. Fomunung also testified that Rabbers had "marked" difficulties in maintaining social functioning, "marked" difficulties in maintaining concentration, persistence, or pace, and "four or more" repeated episodes of decompensation. The ALJ considered, but ultimately rejected, this testimony. Rabbers asserts that the ALJ was required to afford controlling weight to Dr. Fomunug's opinions because Dr. Fomunung was his treating physician.

Rabbers is correct that the opinions of treating sources are generally entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *Rogers*, 486 F.3d at 242. An ALJ must give the treating source's opinion on the nature and severity of the claimant's impairment controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors in determining what weight to give the opinion. *Id.* These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* §§ 404.1527(d)(2)(i)-(ii), (d)(3)-(6). As discussed above, the ALJ must give "good

---

[9]Rabbers's own testimony regarding his symptoms was insufficient to establish that he met the B criteria of one of the listed impairments. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . .").

reasons" for the weight given to the treating source's opinion. *Id.*; *Wilson*, 378 F.3d at 544.

Here, the ALJ properly rejected Dr. Fomunung's opinion. He concluded that it was "not supported by the medical records and treatment notes from previous treating psychiatrists or psychologists. . . . [A]ll treatment notes indicate mild or no symptoms and no side effects from medications." In fact, throughout the course of his treatment, Rabbers never reported any sedative side effects of his medication. Further, the ALJ noted that Dr. Fomunung only saw Rabbers for about fifteen to thirty minutes every two to three months. Accordingly, the ALJ afforded "greater weight to the opinions of Dr. Mulder and Dr. O'Brien since they [were] consistent with the objective medical evidence of record." The ALJ gave several valid reasons why Dr. Fomunung's assessment was contrary to the other substantial evidence in the record. *See Bass v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007) (holding that ALJ properly rejected treating source's opinion where, among other things, "other evaluators found that plaintiff was not disabled, a finding the ALJ found to be better supported by objective medical evidence"); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (holding that substantial evidence supported the rejection of treating sources' opinions). Because the ALJ properly rejected the only evidence in the record that would have potentially supported a finding that Rabbers satisfied the B criteria of a listed impairment, his failure to specifically rate the B criteria did not prejudice Rabbers on the merits.

**IV.**

We hold that the ALJ's failure to rate the B criteria, while error, was harmless in this case. Accordingly, we **AFFIRM** the district court's decision upholding the Commissioner's denial of Rabbers's application for disability insurance benefits.

---

**DISSENTING IN PART AND CONCURRING IN PART**

---

HOLSCHUH, District Judge, dissenting in part and concurring in part. This appeal involves an important issue in the administration of the law applicable in Social Security appeals. When an ALJ intentionally or negligently violates the law, in this case 20 C.F.R. § 404.1520a that sets forth a mandated special technique for the evaluation of claims based on mental illness, is such a violation merely of a regulation intended only for the internal administration of the business of the Social Security Administration or is it a violation of a regulation intended to confer important procedural benefits upon such claimants?

Any discussion of this issue must start with this court's decision in *Wilson v. Commissioner of Social Security*, 378 F.3d 541 (6th Cir. 2004).

**I. The *Wilson* Case**

In *Wilson*, as in the present case, the ALJ violated the Social Security Administration's own procedural regulation. The regulation in *Wilson*, 20 C.F.R. § 404.1527(d)(2), provided, in part, that, "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." The court gave three reasons for this procedural requirement.

First, "to let claimants understand the disposition of their cases." The quoted portion of the sentence is from *Snell v. Apfel*, 177 F.3d 128 (2d Cir. 1999) in which the court said, "the requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases—and perhaps especially—when those dispositions are unfavorable." *Id.* at 134. The *Snell* court explained that when a claimant knows her physician has deemed her disabled, and no reason has been given for rejecting that physician's opinion, she might be "bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Id.* The *Wilson* court adopted this language and reasoning to illustrate the importance

of a regulation that enables a claimant to understand the outcome of the claimant's case. *Wilson,* 378 F.3d at 544.

The second reason given by the *Wilson* court for the regulation was that "the requirement also ensures that the ALJ applies the treating physician rule." *Id.*

The third reason for the requirement was that it "permits meaningful review of the ALJ's application of the rule." *Id.*

The Sixth Circuit in *Wilson* emphasized the importance of a federal agency following its own regulations:

> It is an elemental principle of administrative law that agencies are bound to follow their own regulations. As the Ninth Circuit well summarized in applying this principle: "The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates. *See Vitarelli v. Seaton*, 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954). An agency's failure to follow its own regulations 'tends to cause unjust discrimination and deny adequate notice' and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, 'even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.' *Vitarelli,* 359 U.S. at 547, 79 S.Ct. 968 (Frankfurter, J., concurring); *see also* Note, *Violations by Agencies of Their Own Regulations*, 87 Harv. L. Rev. 629, 630 (1974) (observing that agency violations of regulations promulgated to provide parties with procedural safeguards generally have been invalidated by courts)."

*Id*. at 545 (quoting *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (parallel citations and circuit court citations omitted)).[1]

---

[1] The sentence in the above quotation from *Wilson*, "[a]n agency's failure to follow its own regulations 'tends to cause unjust discrimination and deny adequate notice' and consequently may result in a violation of an individual's constitutional right to due process," while true, is found in *NLRB v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 20 (9th Cir. 1971), not in *Vitarelli v. Seaton*, 359 U.S. 535, 547 (1959). In *Vitarelli*, Justice Frankfurter did say that:

> An executive agency must be rigorously held to the standards by which it professes its action to be judged. *See Securities & Exchange Commission v. Chenery Corp*., 318 U.S. 80, 87-88. Accordingly, if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. *See Service v. Dulles*, 354 U.S. 363. This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly

Of great importance in the present case is the *Wilson* court's rejection of the argument that failure to follow the regulation in that case was harmless error. The court held that even if the record should show that there would be little chance for success if the case were remanded, a violation of the agency's own rules cannot be excused as harmless error.

> "[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n. 41 (D.C. Cir. 1977); *see also Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs*, 102 F.3d 1385, 1390 (5th Cir. 1996). To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to "set aside agency action . . . found to be . . . without observance of procedure required by law." Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (2001).

*Id.* at 546.

With reference to when an agency's violation of its own regulations would *not* require a remand, the court noted that when a regulation merely provides for the orderly transaction of the agency's business and does not confer any substantial right on a claimant, it is necessary for the claimant to show prejudice as a result of the violation before a remand is ordered.

> The Supreme Court has recognized the distinction between regulations "intended primarily to confer important procedural benefits upon individuals" and regulations "adopted for the orderly transaction of business before [the agency]." *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (internal quotation marks omitted). In the former case, the regulation bestows a "substantial right" on parties before the agency, and "it is incumbent upon agencies to follow their own procedures . . . even where

---

so. He that takes the procedural sword shall perish with that sword. 359 U.S. at 546-47. Similarly, in the present case, the Social Security Administration "must be rigorously held to the standards by which it professes its action to be judged," and having enacted 20 C.F.R. § 404.1520a, having taken "the procedural sword," its conduct in violation of that regulation should cause that conduct to "perish with that sword."

the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *see also Vitarelli v. Seaton*, 359 U.S. 535, 540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954). In contrast, in the case of procedural rules "adopted for the orderly transaction of business," an agency has the discretion "to relax or modify its procedural rules" and such action "is not reviewable except upon a showing of substantial prejudice to the complaining party." *Am. Farm Lines,* 397 U.S. at 539, 90 S.Ct. 1288 (quotation omitted). Section 1527(d)(2) falls in the former category, creating an important procedural safeguard for claimants for disability benefits. *Snell*, 177 F.3d at 134.

*Id.* at 547.

## II. Application of *Wilson* to the Facts of the Present Case

The majority opinion rejects any application in the present case of the law set forth in *Wilson* regarding the need to reverse and remand when the Social Security Administration has violated its own regulation. It attempts to distinguish *Wilson* with the following arguments.

First, the regulations are different:

Because the opinion of the treating physician plays such a central and important role in a claimant's application for social security benefits, the reasons-giving requirement of § 404.1527(d)(2) serves its own independent and important function: as a safeguard to "ensure[ ] that the ALJ applies the treating physician rule." *Wilson,* 378 F.3d at 544. We are unable to conclude that the same rationale applies in the context of an ALJ's failure to rate the B criteria.

Majority Opinion, p. 14.

I disagree. In my opinion, the ALJ's failure to rate the B criteria and include in the ALJ's decision specific findings as to the degree of limitation in each of the functional areas of the B criteria, as required by law in § 404.1520a, is just as important as the failure of an ALJ to include in his decision the reasons for the weight given the claimant's treating physician, as required by law in § 404.1527(d)(2). As noted, the *Wilson* court gave three reasons why enforcement of the regulation in that case was so important.

1. The regulation lets "claimants understand the disposition of their cases."

2. The regulation "ensures that the ALJ applies the treating physician rule."

3. The regulation "permits meaningful review of the ALJ's application of the rule."

*Wilson*, 378 F.3d at 544.  Those reasons apply with equal, if not greater, force in the present case.

**A. The Need For Claimants to Understand the Disposition of Their Cases**

Section 404.1520a created a "special technique" which the regulation states in subsection (a), "we must follow."  The heart of that special technique is the requirement that the ALJ rate the degree of a claimant's limitations in four functional areas: daily living activities; social functioning; concentration, persistence or pace; and episodes of decompensation; *and* include the findings on each of these areas in the decision that is rendered.

The court in *Wilson* pointed out that if a claimant knows that the claimant's physician has deemed him disabled, the claimant might be especially bewildered when "told by an administrative bureaucracy" that he is not. *Wilson,* 378 F.3d at 544.  In the present case, it is just as likely, as it was in *Wilson,* that the claimant was aware that his treating physician, Dr. Fomunung, was of the opinion that claimant was disabled. Dr. Fomunung testified under oath that Rabbers was disabled as a result of his bipolar mental condition. The transcript of that testimony shows that Dr. Fomunung described Rabbers's condition in great detail, *e.g.*, Rabbers was not able to function at work and even if he could make it to work, "it's just trouble," (A.R. 257); he was not able to follow the demands of a work environment, follow rules and instructions, or get along with co-workers. (A.R. 265).  More importantly, in the context of this particular case, Dr. Fomunung testified regarding the B criteria. He found that with respect to Rabbers's "Restriction of Activities of Daily Living," it would be "mild."  With respect to Rabbers's "Difficulty in Maintaining Social Functioning," the limitation would be "marked." With respect to "Difficulties Maintaining Concentration, Persistence, or

Pace," the limitation would be "marked."  With respect to "Repeated Episodes of Decompensation," Dr. Fomunung found "four or more." (A.R. 266-67).  The only thing that was needed to find Rabbers disabled under the applicable listing was at least two "marked," or one "marked" and three or more episodes of decompensation.[2]

The majority opinion is that "the ALJ's procedural violation [of § 404.1520a] is neither as strong nor as personal" as the ALJ's procedural violation of § 404.1527(d)(2), the regulation at issue in *Wilson*.  Consequently, the majority thinks that a claimant will not be as "'especially bewildered' or offended" by the ALJ's failure to apply the law in the instant case as compared to the bewilderment and offense felt by a claimant when an ALJ fails to apply the law in a case involving § 404.1527(d)(2). Majority Opinion, p. 15. I seriously question whether a court of appeals' opinion regarding the degree of bewilderment or offense a claimant may suffer as a result of an ALJ's unlawful conduct is a valid measurement of how that conduct should be treated by the court.  I believe that *any* violation of the law by an ALJ that affects a claimant, who expects the ALJ to apply the law properly and fairly, is very serious and should not be subject to how "bewildered or offended" the claimant may or may not be as a result of that violation.

**B. The Need to Ensure that Administrative Law Judges Apply the Law**

In *Wilson*, this court explained that the second reason why enforcement of the regulation in that case was so important was that the regulation "ensures that the ALJ applies the treating physician rule." *Wilson,* 378 F.3d at 544.  In response to this finding, the majority states that, "[w]e are unable to conclude that the same rationale applies in the context of an ALJ's failure to rate the B criteria." Majority Opinion, p. 14.  I disagree.  It is just as important in the present case as it was in *Wilson* to ensure that administrative law judges apply the regulation in question, a regulation dealing with a required special technique and a disclosure in the ALJ's decision of the required findings the ALJ must make. In *Wilson*, the court said that to excuse non-compliance simply because there is substantial evidence that a different outcome on remand is unlikely

---

[2]20 C.F.R. Pt. 404, Subpt. P., App. 1, §12.04(B).

would not be right. "To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." *Wilson*, 378 F.3d at 546.

I believe that the same reasoning is applicable in this case. To not reverse a decision which resulted from the ALJ intentionally or negligently violating the law required for a fair decision would "afford the Commissioner the ability [to] violate the regulation with impunity and render protections promised therein illusory." *Id.* Furthermore, an agency's failure to follow its own regulations "tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process." *NLRB,* 443 F.2d at 20.

### C. The Need for a Meaningful Review of the ALJ's Decision

The third reason given in *Wilson* as to why enforcement of the regulation requiring disclosure of specific reasons for the weight given to the treating physician's opinion is important is that it "permits meaningful review" of the ALJ's application of the regulation requiring an ALJ to give more weight to opinions from treating physicians. The need for a meaningful review applies with equal, if not greater force, in the present case. As noted earlier, the heart of the special technique for evaluating mental impairments is the mandatory application of that procedure and the disclosure of the required B criteria findings by the ALJ. Rather than just a requirement to disclose the ALJ's reasons for the ALJ's evaluation of a treating physician's opinion, the regulation in the present case requires that the ALJ make and also disclose the *ALJ's own opinions* regarding the B criteria which are critical to a finding of disability or no disability. As noted earlier, the fact that a reviewing court is of the opinion that based on the record presented to the court, the claimant would have little success on the merits anyway is not a sufficient reason to not enforce compliance with the regulation. *Wilson,* 378 F.3d at 546. A person is entitled by law to know how the ALJ evaluated the B criteria so that the claimant can argue whether the ALJ's evaluation is supported by or in conflict with the evidence and whether an appeal is warranted. A complete record,

one that is required by law, is necessary not only for the benefit of the claimant but also for the benefit of a reviewing court.

### III. 20 C.F.R. § 404.1520a is Not Merely an "Adjudicatory Tool"

I believe, for the reasons stated above, that the rationale of the *Wilson* case does apply, with equal, if not greater force, in the context of an ALJ's failure to rate the B criteria. The majority, however, states that the law specifically requiring an ALJ to assign a score to each functional area of the B criteria and to publish the ALJ's evaluations "strikes us more as an 'adjudicatory tool' designed to aid the SSA in determining the severity of a claimant's mental impairment." Majority Opinion, p. 14. I disagree. *Wilson*, of course, did draw the distinction between regulations intended primarily to confer important procedural benefits upon individuals and regulations adopted only for the orderly transaction of business before the agency. In the former case, an agency must follow its own procedures, whereas in the latter case the agency's action is not reviewable except upon a showing of substantial prejudice to the complaining party. *Supra,* p. 4. The only authority cited by the majority in support of its opinion that § 404.1520a is nothing more than an "adjudicatory tool" is an unpublished per curiam opinion, *Clark v. Sullivan*, No. 92-1030, 1992 WL 296709, at *4 (6th Cir. Oct. 19, 1992) (per curiam).

*Clark* is inapplicable in the present case. That case involved an allegation that the ALJ erred by not requiring a psychiatrist who had submitted a report of his examination to also complete the Psychiatric Review Technique form (PRT form), although two other doctors had in fact completed the PRT form. *Id.* The *Clark* decision contains a single sentence reference to the ALJ's failure to have a psychiatrist complete the PRT form—"[t]he failure to complete the Psychiatric Review Technique form, an adjudicatory tool, see 20 C.F.R. § 404.1520a(d) (1992), is not significant." It is followed by this statement: "Moreover, nothing in the record indicates that Mrs. Clark has a mental impairment. None of her treating physicians noted any mental problems or recommended psychiatric treatment." *Id.* Thus, *Clark* is an unpublished per curiam opinion by a panel of this court with no analysis whatsoever for the bare conclusion that

the regulation in effect at that time was "an adjudicatory tool," and the remark was made in the context of a record that contained absolutely no evidence of any mental impairment.

Furthermore, the regulations in effect at the time of the *Clark* decision required that the PRT form be completed at the initial and reconsideration levels and also at the administrative law judge hearing and Appeals Council levels. The administrative law judge, either alone or with the assistance of a medical advisor, was required to complete the form, and for all cases involving mental disorders at the administrative law judge hearing or Appeals Council levels, the form had to be appended to the decision.[3] The current regulations do *not* require that this form be completed at all levels of the process. Instead, it was recognized that the PRT form

> . . . simply documents application of the technique with a checklist of our conclusions . . . Administrative law judge and Appeals Council decisions include a more detailed explanation of the findings and conclusions reached, supported by a narrative rationale. The decisions under these final rules *must include*, among other things, the *pertinent findings and conclusions required in the application of the technique.*

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50757 (August 21, 2000) (emphasis added).

Therefore, while the form itself, being a "checklist" regarding application of the special technique at the lower initial and reconsideration levels, arguably could be considered an "adjudicatory tool" at those stages, it obviously is *not* an "adjudicatory tool" at the ALJ and Appeals Council levels. As explained above, the form is not needed at those levels because the *decisions themselves must* contain "the pertinent findings and conclusions required in the application of the technique." Section 404.1520a(e)(2) provides:

> At the administrative law judge hearing and Appeals Council levels, and at the Federal reviewing official, administrative law judge, and the

---

[3]*See* Federal Old-Age, Survivors, and Disability Insurance; Listing of Impairments–Mental Disorders, 50 Fed. Reg. 35038, 35065 (Aug. 28, 1985) for relevant commentary and the text of § 404.1520a(d) as it existed at the time of the *Clark* decision.

> Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, *the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.*

(Emphasis added).  The "functional areas described in paragraph (c) of this section" are the B criteria.

The only other comment made by the majority regarding its belief that § 404.1520a is simply a regulation enacted for the benefit of the agency and not for the benefit of claimants is a reference to the difference between the word "us" and the word "you."  Section 404.1520a(a) states, in the introductory "general" section, that the special technique helps "us" to:

> (1) Identify the need for additional evidence to determine impairment severity;

> (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and

> (3) Organize and present our findings in a clear, concise, and consistent manner.

To find that the use of the word "us" instead of "you" in the general introductory paragraph to § 404.1520a makes that regulation merely for the benefit of the agency, and not for the benefit of the claimant, is, in my view, unsupportable.  How can it be said, for example, that a regulatory requirement imposed on the ALJ to set forth in the ALJ's opinion the specific findings as to the degree of limitation in each of the functional areas of the B criteria be solely for the benefit of the agency and not for claimants?

Contrary to the majority opinion, I believe that the regulation governing evaluation of mental impairments was not enacted merely for the benefit of the agency

but was obviously enacted for the benefit of persons claiming mental impairments who are entitled to have their claims processed fairly and in strict compliance with the special technique regulation and entitled to have the required findings made known to them in documentary form, especially in any decisions by the ALJ and the Appeals Council.

While there may indeed be rare instances in which failure to comply with the regulation can be found to be harmless error—the *de minimis* violation in *Clark* is an example—the present case is obviously not such a case. The present case includes vastly different opinions regarding the claimant's disability, including specific findings of disability by the claimant's own treating psychiatrist. This is clearly a case of a regulation of exactly the same nature as the one in *Wilson*—one intended to confer important procedural benefits on claimants—and is subject to exactly the same requirement that it be "scrupulously observed," because "[a]n agency's failure to follow its own regulations 'tends to cause unjust discrimination and deny adequate notice' . . . of an individual's constitutional right to due process." *Wilson,* 378 F.3d at 545 (citation omitted).

### IV. The Ease With Which a Court of Appeals Can Make its Own Findings of Fact is Not a Valid Reason to Reject the Reasoning of the *Wilson* Case.

The last effort of the majority to distinguish the *Wilson* case is its finding that, as compared with the regulation in that case, "it is much easier for a reviewing court to determine whether an error under § 404.1520a is harmless." Majority Opinion, p. 15. According to the majority, if the reason-giving requirement of § 404.1527(d)(2) is violated, as it was in *Wilson*, it is difficult for the court of appeals to "make a judgment as to what the ALJ's reasons [for rejecting the treating physician's opinion] would have been." *Id.* The majority finds that if the special technique application and documentation requirement of § 404.1520a is violated, as it was here, it is easier for the court of appeals to "make a judgment as to what the ALJ's reasons would have been" and to make its own factual findings. I do not believe, however, that the ease or the difficulty with which a court of appeals can make its own findings that the law requires an ALJ to make and provide in the ALJ's decision should make any difference as to how this regulation should be enforced. The court of appeals in *Wilson* did not vacate the judgment of the

district court because it had difficulty in deciding what reasons the ALJ would have given if he had complied with the regulation.  It did not even mention such a problem.  It vacated the judgment of the district court for one reason and one reason only—the agency violated its own regulation, and the violation was not a *de minimis* violation.

## V. The Majority's Search For Prejudice or No Prejudice

The *Wilson* court noted that, unlike a regulation that confers a substantial right on a claimant, a regulation which is adopted only for the orderly transaction of the agency's business "is not reviewable except upon a showing of substantial prejudice to the complaining party." *Wilson*, 378 F.3d at 547 (quoting *American Farm Lines*, 397 U.S. at 539).  Because the majority in the present case believes that § 404.1520a is nothing more than an "adjudicatory tool" enacted for the benefit of the agency in the orderly transaction of the agency's business, it necessarily had to determine whether the violation of the regulation resulted in substantial prejudice to Rabbers.  This, in turn, led the majority to search the record for evidence that would be relevant to each of the four B criteria functional limitations.  As a result, the majority makes its own findings of fact:

1. "Rabbers did not have a marked restriction in his activities of daily living." Majority Opinion, p. 17.

2. "[T]he record does not indicate that Rabbers had marked difficulties in maintaining social functioning." Majority Opinion, p. 18.

3. "As to the third functional area—maintaining concentration, persistence, or pace—there is no evidence that Rabbers suffered marked difficulties." Majority Opinion, p. 19.

4. "Finally, with respect to the last of the four functional areas, the record shows that Rabbers experienced only one or two episodes of decompensation." Majority Opinion, p. 19.

To support a finding of no prejudice and therefore its opinion that the violation was a harmless error, the majority also noted that the ALJ properly rejected Dr.

Fomunung's opinion for the reasons given by the ALJ, and that Dr. Fomunung's opinion was "the only evidence in the record that would have potentially supported a finding that Rabbers satisfied the B criteria of a listed impairment." Majority Opinion, p. 21.

Because I regard the regulation that the ALJ violated as a law that confers substantial procedural rights on a claimant, it is not necessary, in my opinion, to scour the record and make findings of fact that the ALJ was required by law to make. Instead, it is my belief that a violation of this type of regulation requires the court of appeals to vacate the judgment of the district court and remand the case with instructions that the ALJ comply with the law and make the required findings, *unless* the violation is a *de minimis* violation or a remand would be a useless formality.[4] In the *Wilson* case, this court quoted from *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n. 6 (1969), that where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game." *Wilson*, 378 F.3d at 547.

Accordingly, the only question in a case of this nature is whether the ALJ's intentional or negligent violation of the law can be considered to be a *de minimis* violation or, if not a *de minimis* violation, is there any reason why the case should not be remanded with instructions that the ALJ comply with the law and make the required findings on the four functional limitations listed in the B criteria.

---

[4]In fact, the Commissioner recognizes that a different standard of review applies in such cases when he refers in his brief to the "heightened harmless error standard described in *Wilson.*" (Appellee's Br. 17).

**VI. Remand in This Particular Case Would be an Idle and Useless Formality**

As the majority correctly observed, the only medical evidence in the record that could support a finding by the ALJ that Rabbers's condition met the B criteria is the testimony of Dr. Fomunung.[5]

I also conclude, as did the majority, that "the ALJ properly rejected Dr. Fomunung's opinion" for the reasons given in the majority opinion. The obvious result, therefore, of any reversal and remand would be a repetition by the ALJ of his rejection of Dr. Fomunung's opinion for exactly the same reasons he previously explained. There then being no medical evidence to counter the medical evidence relied upon by the Commissioner, requiring the ALJ to make the necessary B criteria findings would be fruitless.

While I do not regard the intentional or negligent violation of the law by the ALJ to be in any sense a *de minimis* violation, this is a rare case in which a reversal and remand would be an "idle and useless formality." For that reason, and for that reason alone, I concur with the judgment of this court affirming the district court's decision upholding the Commissioner's denial of Rabbers's application for disability insurance benefits.

**VII. Conclusion**

I dissent from the majority's opinion that the reasons for a reversal and remand when an agency violates its own law, as set forth in this court's opinion in *Wilson*, do not apply to the regulation in this case which the majority believes is a mere "adjudicatory tool." I concur with the majority's affirmance of the district court's judgment upholding the Commissioner's denial of Rabbers's application for disability benefits, only because a reversal and remand under the particular circumstances of this case would be futile.

---

[5]The majority opinion notes that Rabbers's own testimony regarding his symptoms was insufficient to establish that he met the B criteria of one of the listed impairments. According to 42 U.S.C. § 423(d)(5)(A), "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . ."