**Theresa L. LANE, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**Case No. 3:10–cv–467.**

United States District Court,
S.D. Ohio,
Western Division at Dayton.

Jan. 27, 2012.

Gary Marc Blumenthal, Horenstein, Nicholson & Blumenthal, Dayton, OH, for Plaintiff.

John J. Stark, U.S. Attorney Office, Columbus, OH, Patrick Edsenga, Social Secu-

rity Administration—Office of General Counsel, Chicago, IL, for Defendant.

**ENTRY AND ORDER OVERRULING LANE'S OBJECTIONS (Doc. # 12) TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS; ADOPTING THE MAGISTRATE JUDGE'S· REPORT AND RECOMMENDATIONS (Doc. # 11) IN ITS ENTIRETY; AFFIRMING THE COMMISSIONER'S DECISION THAT LANE WAS NOT DISABLED PRIOR TO JANUARY 14, 2009; AND TERMINATING THIS CASE**

THOMAS M. ROSE, District Judge.

Plaintiff Theresa L. Lane ("Lane") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Defendant Commissioner of Social Security (the "Commissioner") that she was not disabled and, therefore, not entitled to Social Security disability benefits before January 14, 2009. On December 19, 2011, United States Magistrate Judge Michael J. Newman ("Magistrate Judge Newman") entered a Report and Recommendations (doc. # 11) recommending that the Commissioner's Decision be affirmed. Lane subsequently filed Objections (doc. # 12) and the time has run and the Commissioner has not responded to Lane's Objections. This matter is, therefore, ripe for decision.

Lane filed applications for disability insurance benefits ("SSD") and supplemental security benefits ("SSI") on September 16, 2004, alleging disability due to epilepsy, a tear in the rotator cuff of her right shoulder, arthritis, irritable bowel syndrome, migraines, severe acid reflux disorder, a hiatal hernia, diverticulitis, depression and chronic bronchitis. The alleged onset date was January 16, 2004.

The Commissioner denied Lane's applications initially and on reconsideration. Administrative Law Judge ("ALJ") Thomas McNichols held a hearing following which he determined that Layman is not disabled. The Appeals Council denied Lane's request for review and ALJ McNichols' decision became the Commissioner's final decision.

Lane then appealed to this Court pursuant to 42 U.S.C. § 405(g). Subsequently, based upon a joint motion, the Court remanded the matter to the Commissioner for further administrative proceedings. On remand, the Appeals Council vacated ALJ McNichols' decision and remanded the matter back to ALJ McNichols for further proceedings.

ALJ McNichols then held a second administrative hearing on September 1, 2010. He then issued a decision that Lane was not disabled prior to January 14, 2009, but became disabled on that date. This decision became the Commissioner's final decision and Lane has again appealed to this Court pursuant to 42 U.S.C. § 405(g).

After considering the Administrative Record and briefing by the Parties, Magistrate Judge Newman issued a Report and Recommendations recommending that the Commissioner's decision that Lane was not disabled prior to January 14, 2004—her fiftieth birthday—be affirmed. Based upon the reasoning and citations of authority set forth in the Magistrate Judge's Report and Recommendations (doc. # 10) and in Lane's Objections (doc. # 11), as well as upon a thorough de novo review of this Court's file, including the Administrative Transcript, and a thorough review of the applicable law, this Court adopts the aforesaid Report and Recommendations in its entirety and, in so doing, affirms the Commissioner's decision that Lane was not disabled prior to January 14, 2009.

This Court's function is to determine whether the record as a whole contains substantial evidence to support the

ALJ's decision. *Bowen v. Commissioner of Social Security*, 478 F.3d 742, 745–46 (6th Cir.2007). This Court must also determine whether the ALJ applied the correct legal criteria. *Id.*

■ Regarding the substantial evidence requirement, the ALJ's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(citing *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law) against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

The second judicial inquiry-reviewing the ALJ's legal criteria-may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. A reversal based on the ALJ's legal criteria may occur, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746(citing in part *Wilson v.*

Commissioner of Social Security, 378 F.3d 541, 546–47 (6th Cir.2004)).

In this case, the ALJ applied the correct legal criteria and the ALJ's decision is supported by substantial evidence. WHEREFORE, based upon the aforesaid, Lane's Objections to the Magistrate Judge's Report and Recommendations are OVERRULED, and this Court adopts the Report and Recommendations of the United States Magistrate Judge in its entirety. The Commissioner's decision that Lane was not disabled prior to January 14, 2009, is affirmed. Finally, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

## REPORT AND RECOMMENDATION [1]

MICHAEL J. NEWMAN, United States Magistrate Judge.

This is a Social Security appeal brought pursuant to 42 U.S.C. § 405(g). In his October 14, 2010 decision, Administrative Law Judge ("ALJ") Thomas McNichols, II found that Plaintiff Theresa Lane ("Plaintiff") was not disabled prior to January 14, 2009, but became disabled on that date—her fiftieth birthday—under a direct application of Grid Rule 201.14 of the Medical–Vocational Guidelines.[2] Plaintiff has objected to the partially favorable ruling of the ALJ.

Plaintiff claims a disability onset date of January 16, 2004. The ALJ's disability finding from January 14, 2009 onward is not challenged by Plaintiff. Therefore, the

---

1. Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendation.

2. Grid Rule 201.14 of the Medical–Vocational Guidelines, found in 20 C.F.R. pt. 404, Subpt. P, App. 2, Tab. 1, dictates a finding of disability in the absence of transferrable skills for a

person age 50–54, is a high school graduate, is limited to sedentary work, and has no direct entry into skilled work. In finding Plaintiff limited to sedentary work and by directly applying the Grid to Plaintiff's age, education, and previous work experience, the ALJ reasonably found Plaintiff to be disabled from her fiftieth birthday onward.

issue before the Court is whether the ALJ erred in finding that Plaintiff was not disabled between January 16, 2004 through January 13, 2009, and therefore unentitled to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") during that time.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. # 6), the Commissioner's Memorandum in Opposition (Doc. # 8), Plaintiff's Reply (Doc. # 10), and the record as a whole.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed her applications for DIB and SSI on September 16, 2004, alleging that she has been under a "disability" since January 16, 2004. Tr. 61–63. Plaintiff claimed to be disabled due to epilepsy, a tear in the rotator cuff of her right shoulder, arthritis, irritable bowel syndrome, migraines, severe acid reflux disorder, a hiatal hernia, diverticulitis, depression, and chronic bronchitis. Tr. 69. Following initial administrative denials of Plaintiff's application, a hearing was held before the ALJ (Tr. 462–95), who determined that Plaintiff was not disabled. Tr. 19–38. The Appeals Council denied Plaintiff's request for review, (Tr. 5–7), and ALJ McNichols' decision became the Commissioner's final decision.

Plaintiff filed an action in this Court seeking judicial review of the Commissioner's decision. *Lane v. Commissioner of Social Security*, No. 3:08–cv–453 (filed December 10, 2008). Subsequently, based upon a joint motion by the parties, the Court remanded the matter to the Commissioner for further administrative proceedings. *Id.* at docs. 10, 11, 12; *see also*, tr. 519–21. On remand, the Appeals Council vacated the ALJ's decision and remanded the matter back to the ALJ for further proceedings consistent with the Court's Remand Order. Tr. 524–26.

Pursuant to the Appeals Council's Order, the ALJ held a second administrative hearing on September 1, 2010, where Plaintiff was represented by counsel. Tr. 795–840. At the hearing, the ALJ heard testimony from Plaintiff, Mary Buban, Psy.D., a medical expert, and Charlotta Ewers, a vocational expert. *Id.* The ALJ issued a partially favorable decision on October 14, 2010, in which he found that Plaintiff was not disabled prior to January 14, 2009, but became disabled on that date. Tr. 501–13.

The ALJ's "Findings," which represent the rationale of the decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity since the alleged disability onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. Since the alleged onset date of disability, January 16, 2004, the claimant has had the following severe impairments: migraines; degenerative changes in the right shoulder; seizure condition controlled with medication; obesity; mild to moderate pulmonary disease; depressive disorder; and (based on evidence beginning in July 2006) schizoaffective disorder and anxiety disorder, including for a time possible posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. Since the alleged onset date of disability, January 16, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that, since January 16, 2004, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no climbing ropes, ladders, or scaffolds; no work above shoulder level on the right; no exposure to hazards; no exposure to irritants; no dealing with the general public; no more than occasional contact with coworkers and supervisors; simple one- or two-step tasks requiring little, if any, concentration; and low stress jobs with no production quotas and no over-the-shoulder supervision.

6. Since January 16, 2004, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was a "younger individual age 45–49." On January 14, 2009, the claimant turned 50, and her age category changed to an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant as not had transferable skills at anytime relevant to this decision (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to January 14, 2009, the date the claimant's age category changed, considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on January 14, 2009, the date the claimant's age category changed, considering her age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that. the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant was not disabled prior to January 14, 2009, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 503–13.

Plaintiff contends that the ALJ erred by not giving proper weight to her treating medical sources, and that the level of deference accorded to each source is unsupported by substantial evidence.

### B. Plaintiff's Vocational Profile and Testimony

Plaintiff turned fifty years old on January 14, 2009, and was therefore considered "closely approaching advanced age" from that date through the date of the ALJ's opinion. *See* 20 C.F.R. § 404.1563. Plaintiff was considered a "younger person" from the alleged onset date, January 16, 2004, until her fiftieth birthday. *Id.*

Plaintiff has her GED. Tr. 77. Her past relevant work is as a cashier and fast food worker. Tr. 70–71. At the time of the hearing in September 2010, she was slightly over five feet tall, and weighed approximately 345 pounds. Tr. 800.

Plaintiff testified at the first administrative hearing that she was terminated from her job in 2004 due to a complaint. Tr.

468. She testified that she had been getting migraine headaches approximately two times per week and, because of her weight, could "hardly stand for more than 10 to 15 minutes." *Id.* She testified that she had not attempted to work since 2004 because her migraine headaches had gotten worse. *Id.*

Plaintiff also testified that she suffered from bipolar disorder, which made her fearful to leave her residence. Tr. 470–71. She claimed to be afraid of people, and felt like they were watching her. Tr. 471. At the hearing, Plaintiff reported that her counseling sessions recently ended and her depression "got better." *Id.* Plaintiff acknowledged that her depression and bipolar disorder were both well-controlled with medication. Tr. 471–72.

As to her daily activities, Plaintiff testified that beyond occasionally cleaning the bathroom, she generally does not perform any household chores because of her headaches and weight. Tr. 477–78. She further testified that she does not go shopping because of her fear of crowds. Tr. 479. Friends and relatives visit her at her residence. *Id.* On a typical day, Plaintiff spends her time watching television, reading, taking naps, and sitting on the couch. Tr. 481–82.

Plaintiff testified at the second administrative hearing that she stopped working in 2004 because she had a nervous breakdown. Tr. 803. She then testified that her first nervous breakdown was in June 2006. *Id.* She further testified that she had to quit her job in 2004 because of her stress and nerves. Tr. 803–04.

Plaintiff testified that she was depressed and cried almost everyday. Tr. 807. She also said that she has a migraine headache almost daily. Tr. 806. Plaintiff claimed to be afraid of people and avoided them because she felt everyone was looking at her. Tr. 808. She reported panic and anxiety attacks whenever leaving the house. Tr. 808–09.

Plaintiff testified that she goes to counseling twice a month, and that she had not been hospitalized for anxiety, depression, or any mental condition. Tr. 810. Plaintiff is able to dress, groom, and feed herself, but generally does not do household chores or go shopping. Tr. 815–18. She claimed that everything depresses her. *Id.*

Plaintiff acknowledged that friends and relatives will visit her at her residence. Tr. 816. On a typical day, she will watch television, crochet, do puzzles, play games on the computer, or chat with others over instant messenger on the computer. Tr. 816–20.

## C. Medical Source Opinions

### 1. Plaintiff's Treating Medical Sources

#### A. Philip White, M.D. ("Dr. White")—Neurologist

Plaintiff treated with Dr. White, a neurologist, for seizures and headaches. When initially seen in March 2002, Plaintiff described experiencing seizure-type episodes most of her life. Tr. 256–58. At the time, she reported one to two seizures a week. Tr. 256. Dr. White noted Plaintiff's depression and spells of crying. After losing her medical insurance in April 2004, Plaintiff began seeing Dr. White only once or twice per year. Tr. 242–43, 344, 408, 417.

By March 2004, however, Plaintiff's seizures were well-controlled by medication. *See* tr. 245. On March 24, 2005, Plaintiff reported to Dr. White that she had not had a seizure in the past year. *Id.* Nevertheless, Dr. White noted his concern regarding Plaintiff's depression and headaches. For instance, in November 2005, Dr. White reported that Plaintiff had "nearly daily migraine headaches and has had

these for many years." Tr. 342. According to Dr. White, Plaintiff's headaches "interfere with her ability to function during the day and I have not known her to be completely free of any headaches at any point." *Id.* Dr. White opined, however, that "[t]he headaches themselves would not completely disable her, but certainly make working a much more difficult proposition." Tr. 342. Regarding Plaintiff's employability, he opined that "she would require a sedentary job if she were able to work at all." *Id.*

Regarding Plaintiff's depression, Dr. White noted that Plaintiff had "been severely depressed for a long as I have been acquainted with her," and that the severity of her depression alone would likely preclude full-time work activity. *Id.* Dr. White opined that because Plaintiff's morbid obesity limited her ability to walk, "if she were to work at all, she would be limited to sedentary work." *Id.* Dr. White concluded that Plaintiff's prognosis was "extremely poor and that there is little hope for a significant improvement in either her depression or headaches." *Id.* However, in making these opinions, Dr. White cautioned, "I can make some comment on some of [Plaintiff's] problems, but most of the medical conditions for which she has qualified for disability fall outside my area of expertise." Tr. 342–43.

On September 8, 2006, Dr. White reported Plaintiff to be seizure-free, but noted she continued to be depressed and suffered from headaches almost daily. Tr. 412. In an office note dated October 6, 2006, Dr. White opined, "I don't think that [Plaintiff] is at all employable because of the severe headaches, as well as the depression and anxiety that she suffers." Tr. 410.

On October 6, 2006 and September 19, 2008, Dr. White completed residual functional capacity ("RFC") assessments on Plaintiff's behalf. Tr. 574–77. In both RFC assessments, he opined that Plaintiff could stand/walk for one hour out of eight, and lift/carry up to five pounds frequently. Tr. 575, 577. He found that Plaintiff's impairments did not impact her ability to sit, but she was moderately limited in her ability to reach. *Id.* Dr. White reported his belief that Plaintiff was "unemployable" for twelve months or more. *Id.* His findings were based on arthritic changes in her joints, decreased range of motion of her low back, a depressed affect, and her crying spells. *Id.*

Clinical notes from December 28, 2007 through September 11, 2009 showed Plaintiff's seizures were under control with medication. Tr. 583–90, 733–34. Dr. White noted, however, that Plaintiff continued to complain of daily headaches, which were exacerbated with stress. *Id.*

On August 24, 2009, Dr. White completed interrogatories at the request of the Social Security Administration ("SSA"). Tr. 626–33. Dr. White reported that Plaintiff's "primary problem is not her seizures, but depression and anxiety." Tr. 633. He opined that Plaintiff's sitting and postural activities were not affected by her impairments, and that she would be able to sit for eight full hours in an eight-hour workday. Tr. 630. He also opined that Plaintiff's ability to stand and walk were not affected by her impairments, and that she could stand and walk for eight hours out of an eight-hour workday. Tr. 629. He noted his belief that Plaintiff could stand and walk for four hours without interruption. *Id.* Dr. White also noted that Plaintiff could lift/carry up to ten pounds frequently and twenty pounds occasionally. *Id.*

Nevertheless, Dr. White opined that Plaintiff was unable to be prompt and regular in her work attendance, withstand the pressures of meeting normal standards of work productivity, or complete a normal workday or workweek without interruptions from psychologically or physically-

based symptoms. Tr. 627–28. He stated that Plaintiff's "[s]tress could easily cause her to decompensate emotionally" and "would be a significant problem for her completing tasks in a timely manner." Tr. 628. Dr. White believed that Plaintiff could perform neither light work nor sedentary work. Tr. 633. Because of her seizures, he noted that Plaintiff was never to climb and she could occasionally balance. Tr. 630. He further noted that on account of her seizures, she should be restricted from heights, moving machinery, and driving. Tr. 631–32.

### B. Stephanie Fronista–Ward, M.D. ("Dr. Fronista–Ward")— Primary Care

Plaintiff treated with Dr. Fronista–Ward, a primary care physician, from December 23, 2002 through September 25, 2006. Tr. 214–38, 353–69. On March 1, 2003, Plaintiff reported that she was "crying all the time." Tr. 232. Dr. Fronista–Ward treated Plaintiff's depression and crying spells with Zoloft. Tr. 220, 222, 226, 232. In May 2003, Plaintiff was in a car accident that aggravated her neck and headache pain. Tr. 226. An x-ray of her cervical spine, taken on May 21, 2003, showed mild diffuse degenerative changes. Tr. 232. Dr. Fronista–Ward diagnosed cervical strain and mild degenerative disc disease. Tr. 226. After Plaintiff's car accident, she was seen for physical therapy for whiplash and right shoulder pain. Tr. 176–204.

Plaintiff attended physical therapy again in February 2004 for continued daily headaches that started after her motor vehicle accident. Tr. 158–75. Dr. Fronista–Ward continued to treat Plaintiff for social anxiety disorder and depression, as well as migraines. Tr. 361–68.

On September 5, 2006, Dr. Fronista–Ward noted that she treated Plaintiff "for major depression, anxiety with panic attacks," as well as chronic bronchitis and gastroesophageal reflux disease. Tr. 359.

On September 25, 2006, Dr. Fronista–Ward completed interrogatories at the request of SSA. Tr. 353–58. Dr. Fronista–Ward indicated her belief that Plaintiff's "psychiatric disease has interfered with her ability to get regular treatment from our office." Tr. 355. Dr. Fronista–Ward opined that Plaintiff would not be able to be prompt and regularly attend a job because "at times [Plaintiff] has told me she can't leave the house." Tr. 356. Dr. Fronista–Ward reported that Plaintiff's panic attacks prevented her from meeting standard work productivity and accuracy expectations, and that her agoraphobia would make her unreliable as an employee. Tr. 357.

### C. Sally Kennedy, LISW/Eastway Behavioral Health ("Ms. Kennedy")—Therapist

Plaintiff was initially assessed at Eastway Behavioral Health by Ms. Kennedy, a therapist, on August 23, 2005. Tr. 323–35. Plaintiff reported that for the previous year she had decreased energy, motivation and attention. Tr. 323. She had a "minimal desire to leave house or engage socially." *Id.* Ms. Kennedy noted that Plaintiff "seems to have minimal insight re: correlation between health problems [and] depressed mood" and that she is "seeking m[ental] h[ealth] services to follow lawyer's recommendation, and to alleviate the depressed mood." *Id.*

Ms. Kennedy diagnosed Plaintiff with a depressive disorder NOS (not otherwise specified) and assigned Plaintiff a Global Assessment of Functioning (GAF) of 48.[3]

---

**3.** "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and oc-

cupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological

Tr. 331. Ms. Kennedy reported that Plaintiff's memory, insight, concentration, and attention were all mildly impaired. Tr. 333. Ms. Kennedy also reported that Plaintiff's "primary difficulties are health-related" and that "she appears to be somewhat complacent re: lifestyle [and] overall functioning." Tr. 331. Ms. Kennedy recommended counseling to improve Plaintiff's depression, anxiety, coping skills, activity level, self-care, and self-esteem, but noted that "[Plaintiff] is prompted here by her lawyer, therefore personal motivation for treatment is tentative." Tr. 331–32.

Plaintiff treated with Ms. Kennedy for individual therapy sessions until February 3, 2006. Tr. 374–88. Ms. Kennedy observed that Plaintiff had improved over the course of her treatment, but she still had a depressed and constrictive affect. Tr. 382, 384, 386, 388. On February 2, 2006, Ms. Kennedy noted that Plaintiff's "symptoms [are] connected to major health problems including her head trauma, severe bronchitis, and obesity." Tr. 372.

### D. Maria B. Mathias, M.D. ("Dr. Mathias")—Psychiatrist Elaine Pritchett, MS, PCC ("Ms. Pritchett")—Therapist South Community, Inc.

Plaintiff was first evaluated by Dr. Mathias, a psychiatrist, on July 7, 2006. Tr. 438–43. Initially, Plaintiff reported auditory hallucinations, trouble sleeping, decreased energy, decreased concentration, decreased appetite, and guilt. *Id.* She was hypervigilant and thought cameras were watching her. Tr. 438. Dr. Mathias diagnosed Plaintiff with schizoaffective disorder, posttraumatic stress disorder (PTSD),

anxiety disorder, and made differential diagnoses of panic disorder and agoraphobia. Tr. 440. Dr. Mathias assigned Plaintiff a GAF of 40,[4] and prescribed medication and individual therapy. Tr. 440–42. Plaintiff saw Dr. Mathias approximately once per month thereafter for medication management. Tr. 432–37.

On February 8, 2007, Dr. Mathias completed interrogatories at the request of SSA. Tr. 444–53. Dr. Mathias reported that Plaintiff suffered from schizoaffective disorder, depressed type, post traumatic stress disorder and an anxiety disorder, NOS. Tr. 445. According to Dr. Mathias, Plaintiff could not relate predictably in social situations or behave in an emotionally stable manner. Tr. 449. Dr. Mathias opined that Plaintiff had a low stress tolerance and was highly distractible, which made her incapable of withstanding the pressure of meeting normal standards of work productivity. Tr. 448. Dr. Mathias also opined that Plaintiff was extremely limited in her ability to sustain concentration, persistence, and pace, and was markedly restricted in her ability to perform activities of daily living and maintain social functioning. Tr. 452–53

That same day, Dr. Mathias completed a Medical Assessment of Ability to do work-related activities. Tr. 454–56. She opined that Plaintiff had "poor" or "no ability" to do any of the following: deal with the public; interact with supervisors; deal with work stresses; maintain attention/concentration; understand, remember

---

functioning" at or near the time of the evaluation. *See Martin v. Comm'r*, 61 Fed.Appx. 191, 194 n. 2 (6th Cir.2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM–IV–TR") at 32–34. Individuals with scores of 41–50 are classified as having "serious symptoms ... or serious impairment in occupational, social, or school functioning." *Id.* at 34.

4. A GAF of 40 indicates "[s]ome impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." DSM–IV–TR at 32–34.

and carry out complex job instructions; or demonstrate reliability. *Id.*

Beginning in January 2008, Plaintiff began seeing a therapist, Ms. Pritchett, approximately once or twice per month at the same care facility where Dr. Mathias practiced, South Community, Inc. Tr. 700–02. Plaintiff's treatment with Ms. Pritchett involved discussions of stressors and coping techniques, but the treatment notes are generally devoid of Ms. Pritchett's clinical observations, diagnoses, or details of Plaintiff's reported symptoms. *See generally* tr. 634–700.

Dr. Mathias and Ms. Pritchett completed interrogatories in August 2009 at the request of SSA. Tr. 616–25. They commented upon the combined effects of Plaintiff's physical and mental impairments, and noted that her " [a]nxiety and psychotic illness [are] likely to exacerbate migraines, fibromyalgia and irritable bowel syndrome." Tr. 617–18. Dr. Mathias reported that Plaintiff would be unable to perform any of the mental activities needed for work; her mental impairments would make her call off work frequently; she would work at a slow pace; she would be easily distracted and would forget and require redirection; she would have crying spells at work; she "would need frequent and long breaks"; and her feelings would be easily hurt. Tr. 619–24.

Dr. Mathias and Ms. Pritchett reported that Plaintiff had moderate limitations with daily activities and social functioning, and marked limitations in concentration, persistence, and pace. Tr. 624–25. They also opined that Plaintiff had poor to no ability to deal with work stress, function independently, maintain attention/concentration, and understand, remember, and carry out even simple job instructions. Tr. 613–14.

On May 6, 2010, Dr. Mathias reported that Plaintiff was markedly limited in her ability to do the following: remember loca-tions and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination or close proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychologically-based symptoms; accept instructions and respond appropriately to criticism; get along with coworkers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places and use public transportation; and set realistic goals and make plans independently of others. Tr. 742. Dr. Mathias concluded that Plaintiff was "unemployable" for 12 months of more "due to continued psychotic symptoms and depressed mood and anxiety" Tr. 742–43.

### E. Rajindra Bhat, M.D. ("Dr. Bhat")—Internal Medicine

While treating with Dr. Bhat, an internist, Plaintiff underwent an MRI of her right shoulder on December 17, 2007, which revealed a small full thickness tear of the supraspinatus tendon at the humeral attachment, possible arthritic changes, and joint effusion. Tr. 567–68. That same day, she underwent a pulmonary function study which was normal. Tr. 569. Pulmonary function studies done on February 6, 2009 revealed moderate obstructive pulmonary disease. Tr. 581.

On September 1, 2009, Dr. Bhat completed interrogatories at the request of SSA. Tr. 711–18. Dr. Bhat reported that he treated Plaintiff from May 2006 through August 2009 for GERD, chronic bronchitis, IBS, migraine headaches, seizure disorder, obesity, and a right supras-

pinatus tendon tear. Tr. 711. According to Dr. Bhat, Plaintiff would be unable to be prompt and regular in attendance, withstand work pressures, demonstrate reliability, and compete a normal workday or workweek without interruptions from psychological or physical-based symptoms as a result of her impairments. Tr. 712–13. He opined that Plaintiff's impairments restricted her to lifting no more than five pounds frequently, and standing/walking for more than two hours in an eight-hour workday. Tr. 714–15. Dr. Bhat found, however, that Plaintiff's ability to sit was not affected by her impairments, and that she could sit for 8 full hours in an eight-hour workday. Tr. 715. She was never to climb, balance, stoop, crouch, kneel, or crawl. *Id.* Dr. Bhat also limited Plaintiff in reaching and pushing/pulling. She was restricted from heights, moving machinery, chemicals, temperature extremes, dust, noise, fumes, and humidity. Tr. 716. Dr. Bhat concluded that Plaintiff could perform neither light nor sedentary work. Tr. 718.

### 2. Consultative Medical Sources

#### A. Damian M. Danopulos, M.D. ("Dr. Danopulos")

On January 6, 2005, Dr. Danopulos examined Plaintiff on behalf of Ohio Bureau of Disability Determination ("BDD"). Tr. 145–56. Plaintiff's complaints included right shoulder pain, migraine headaches, irritable bowel syndrome, seizures, obesity, and depression. Tr. 145. Plaintiff noted that, since being put on Carbatrol and Keppra, she had only one or two seizures. Tr. 146. She noted that she had constant and continuous headaches since a May 2003 motor vehicle accident. *Id.* Plaintiff also reported that she had right shoulder pain since a 1999 car accident. Tr. 145. Additionally, Plaintiff reported she had been depressed for four years, and that she had been prescribed anti-depressants by her family physician. Tr. 146.

On examination, Plaintiff was 5'3″ tall and weighed 383 pounds. Tr. 147. Dr. Danopulos noted that her right shoulder was painful with a restricted range of motion. Tr. 148. Cervical spine motion was also painful, although within normal limits. Tr. 148, 152. Her lumbar spine motion was restricted but painless, and her right grip strength was decreased. Tr. 149, 151–53.

Dr. Danopulos diagnosed right shoulder arthralgias, tension headaches, history of seizures, severe morbid obesity, early emphysema, and depressed mood. Tr. 150. Dr. Danopulos concluded that Plaintiff's "ability to do any work-related activities is mainly restricted from her unusual morbid obesity plus her early emphysema" and that her seizure history and psychological symptoms "possibly are additional problems which add to her complaints." *Id.*

#### B.J. William McIntosh, Ph.D. ("Dr. McIntosh")

Dr. McIntosh, a psychologist, evaluated Plaintiff on January 31, 2005 at the request of the BDD. Tr. 300–04. Plaintiff reported that she had been taking anti-depressant and anti-anxiety medication for at least four years, which helped her to stay calm and cry less. Tr. 300.

Dr. McIntosh noted that Plaintiff was composed and had an appropriate affect during the examination Tr. 301. Her overall mood was "mildly depressed." *Id.* Dr. McIntosh noted no observable signs of anxiety, and that Plaintiff "described no phobias or panic attacks." Tr. 301–02. Plaintiff reported that she was irritable, had trouble sleeping, experienced decreased energy, and at times heard her mother's voice. *Id.* Plaintiff's recent and remote memory seemed "fairly good," and she could concentrate well enough to write a letter. Tr. 302. Her speech was normal, and she exhibited no preoccupations, obsessions, delusions, or paranoia. *Id.*

Dr. McIntosh diagnosed Plaintiff with mild to moderate dysthymic disorder and assigned her a GAF of 54.[5] Tr. 303. Dr. McIntosh opined that Plaintiff's ability to withstand the stress and pressure of daily work activity was mildly to moderately impaired, and her ability to interact with others was mildly impaired. *Id.* Plaintiff's ability to understand, remember, and carry out one- or two-step job instructions was "fully intact," and her ability to maintain attention and concentration to perform simple, repetitive tasks was "good." *Id.*

### C. Stephen Halmi, Psy.D. ("Dr. Halmi")

Dr. Halmi, a psychologist, evaluated Plaintiff on February 10, 2010 at the request of the BDD. Tr. 719–31. Plaintiff reported that she was able to complete household chores "a little bit at a time," including washing the dishes and keeping the bathroom clean. Tr. 721. She also reported that, on a typical day, she watched television, colored, did word searches, and crocheted. Tr. 721–22. Plaintiff told Dr. Halmi that she socializes with family and friends, and explained: "I received visits from friends and family. I go places if they drive. I go to their house or out to eat. I don't have any problems getting along with people." Tr. 722.

Dr. Halmi observed that Plaintiff was tense, diverted eye contact, had a flat affect, her hands shook, and she had anxiety. Tr. 722–23. She reported experiencing panic attacks in large crowds, being anxious in social situations, and hearing voices telling her to kill herself. *Id.* While WAIS–IV and WRAT–4 testing suggested Plaintiff scored in the mentally deficient range, Dr. Halmi opined to the contrary that Plaintiff's test scores were invalid because she was in mainstream classes in school. Tr. 723–24. Dr. Halmi noted that Plaintiff "may have over endorsed psychopathology on the psychological symptom checklist and during my interview." Tr. 722.

Dr. Halmi diagnosed Plaintiff with depressive disorder, anxiety disorder, and psychotic disorder. Tr. 724. He assigned Plaintiff a GAF of 50. Tr. 725. Dr. Halmi opined that Plaintiff had moderate limitations in her ability to: maintain attention and concentration to perform simple, repetitive tasks; relate to others, including coworkers and supervisors; and withstand work stress and pressure. Tr. 726–27. Dr. Halmi found Plaintiff had no impairment in her ability to understand and follow instructions. Tr. 726.

### 3. Commissioner's Reviewing Medical Sources

### A. Walter Holbrook, M.D. ("Dr. Holbrook")

On January 30, 2005, Dr. Holbrook, opined that Plaintiff could occasionally lift/carry up to twenty pounds and frequently lift/carry up to ten pounds. Tr. 293. She could sit/stand for two hours out of eight and sit for six hours out of eight. *Id.* Dr. Holbrook noted Plaintiff's body-mass index ("BMI") was 70, she was "massively obese," and her obesity limited her ability to stand/walk. *Id.* Dr. Holbrook opined that Plaintiff should avoid climbing ladders, ropes or scaffolds; only occasionally balance, stoop, kneel, crouch, or crawl; avoid reaching in all directions; and should also avoid concentrated exposure to environmental irritants or hazards. Tr. 294–96.

**5.** A GAF score of 55–60 refers to "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV–TR at 34.

## B. Bruce Goldsmith, Ph.D. ("Dr. Goldsmith")

On February 28, 2005, Dr. Goldsmith opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and complete a normal workday or workweek without interruption from psychologically based symptoms. Tr. 305–06. According to Dr. Goldsmith, Plaintiff was not significantly impaired in her ability to interact with others. To that end, he noted Plaintiff's enjoyment of interacting with others via instant messaging and her enjoyment of playing cards on the computer. Tr. 306–07. Dr. Goldsmith found Plaintiff's abilities to understand, remember, and carry out simple instructions and maintain concentration and attention were not impaired. Tr. 307. He concluded that Plaintiff should be "capable of performing simple and some complex tasks without strict time or production demands." *Id.*

### 4. Medical Expert—Mary Buban, Ph.D. ("Dr. Buban")

Dr. Buban, a clinical psychologist, engaged in a lengthy description of the record as the Commissioner's medical expert. Tr. 822–34. Dr. Buban testified before the ALJ that Plaintiff's allegations of panic attacks were not documented in the record in terms of frequency, intensity, or duration. Tr. 828. Dr. Buban further testified that Plaintiff's mental impairments did not meet or equal a Listing based upon the evidence in the record. Tr. 828–29.

Dr. Buban opined that Plaintiff has functional limitations based upon her mental health impairments, and that any work would necessarily be limited primarily to simple, repetitive tasks, and occasionally some detailed tasks. Tr. 829. Dr. Buban testified that Plaintiff should have only occasional contact with co-workers and su-

pervisors. *Id.* She would prohibit Plaintiff from dealing with the general public and performing fast-paced work with high production quotas. *Id.* Dr. Buban noted that Plaintiff had mild restriction in her activities of daily living; moderate limitations in social functioning; moderate limitations in concentration, persistence, and pace: and no episodes of decompensation. Tr. 830.

## II. APPLICABLE LAW

### A. Substantial Evidence Standard

 The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence and if the correct legal criteria were employed by the ALJ. 42 U.S.C. § 405(g); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745–46 (6th Cir.2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Id.* As the Sixth Circuit has explained:

> The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir.1994).

## B. Establishing the Existence of a Disability

To qualify for DIB, Plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(*l*), 423. Establishment of a disability is contingent upon two findings: (1) Plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; and (2) the impairments must render Plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d).

To qualify for SSI benefits, Plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, Plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of non-disability is made and the inquiry ends. *Id.* Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of non-disability is made and the inquiry ends. *Id.* Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). If Plaintiff suffers from an impairment which meets or equals one set forth in the Listings, the Commissioner is to render a finding of disability without consideration of Plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Sec'y of H.H.S.,* 667 F.2d 524, 528 (6th Cir.1981). Fourth, if the individual's impairments do not meet or equal those in the Listings, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. *Id.* If the individual is unable to perform his or her past relevant work, then a *prima facie* case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Kirk,* 667 F.2d at 529.

■ A claimant has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.,* 923 F.2d 1168, 1173 (6th Cir.1990). Once a claimant establishes a *prima facie* case by showing an inability to perform his or her past relevant work, the burden shifts to the Commissioner to show that Plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Harmon v.*

*Apfel,* 168 F.3d 289, 291 (6th Cir.1999). To rebut a prima facie case, the Commissioner must come forward with particularized proof of the claimant's individual capacity to perform alternate work considering the claimant's age, education, and background, as well as the job requirements. *O'Banner v. Sec'y of H.E.W.,* 587 F.2d 321, 323 (6th Cir.1978).

■ A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. § 423(d)(1)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 404.1520 and 404.1524 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 404.1520a. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment[ ]." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir.2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)). The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 *et seq.*). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)).

■ At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Rabbers,* 582 F.3d at 653–54.

A claimant whose impairment meets the requirements of the Listings will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

■ An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of H.H.S.,* 773 F.2d 85, 90 (6th Cir. 1985).

## C. Deference Accorded to Treating Physicians

■ In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir.2007). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (quoting 20 C.F.R. § 404.1502). The reason for the "treating physician rule" is clear: the treating physician has a greater opportunity to examine and observe the patient. *See Walker v. Sec'y of H.H.S.,* 980 F.2d 1066, 1070 (6th Cir.1992). Further, as a result of his or her duty to cure the patient, the treating physician is

generally more familiar with the patient's condition than are other physicians. *Id.*

■■■■■ However, a treating physician's statement that a claimant is disabled is, of course, not determinative of the ultimate issue. *Landsaw v. Sec'y of H.H.S.,* 803 F.2d 211, 213 (6th Cir.1986). Moreover, a treating physician's opinion is only to be given controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Id.*

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See Landsaw,* 803 F.2d at 213. A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is "inconsistent with other substantial evidence of record." 20 C.F.R. § 404.1527(d)(2).

■■■■■ When rejecting a treating medical source, however, the Commissioner must comprehensively set forth the reasons for the weight assigned to a treating physician's opinion. *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir.2009)(citing *Wilson,* 378 F.3d at 545). Furthermore, if the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; and the spe-

cialization of the treating source—in determining the level of weight to give the opinion. *Wilson,* 378 F.3d at 544.

### III. OPINION AND ANALYSIS

The ALJ determined that Plaintiff had the RFC "to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except no climbing ropes, ladders, or scaffolds; no work above shoulder level on the right; no exposure to hazards; no exposure to irritants; no dealing with the general public; no more than occasional contact with coworkers and supervisors; simple one-or two-step tasks requiring little, if any, concentration; and low stress jobs with no production quotas and no over-the-shoulder supervision." Tr. 508–09. Given this RFC, her age, her education, and her work experience, Plaintiff became disabled on her fiftieth birthday, January 14, 2009, under a direct application of Medical–Vocational ("Grid") Rule 201.14. Tr. 512–13.

Plaintiff challenges the ALJ's decision on one ground—namely the ALJ "erred in not finding Plaintiff disabled prior to her fiftieth birthday." Doc. 6, PAGEID 48, 60. Thus, the relevant time period at issue here is January 16, 2004, the alleged onset date, through January 13, 2009—the period of time between her alleged onset date and her fiftieth birthday. For the reasons that follow, the Court finds Plaintiff's sole assignment of error without merit.

### A. The ALJ's Opinion That Plaintiff Was Not Disabled Prior To January 14, 2009 is Supported By Substantial Evidence

Plaintiff contends that the ALJ erred by not giving controlling weight to the opinions of her treating psychiatrist, primary care physician, and neurologist. However, the ALJ's reasoning for according less than controlling weight to each of these

treaters is well-explained in his decision and, in the Court's opinion, is well-supported by substantial evidence.

The ALJ found the opinion of Plaintiff's treating psychiatrist, Dr. Mathias, not to be entitled to controlling weight for several reasons, including: 1) Dr. Mathias' assessments of marked limitations are not consistent with the level of treatment provided; 2) Dr. Mathias' treatment notes do not contain objective evidence to support her diagnoses; 3) Dr. Mathias' treatment notes are brief, often indicating nothing significant other than an anxious affect, and provide no detailed information supporting marked limitations; and 4) Plaintiff's daily activities are not consistent with Dr. Mathias' assessments of marked limitations. *See* tr. 506–07.

▉ While the Court disagrees with the ALJ that hospitalization and intensive psychiatric treatment would be necessary to support an assessment of marked or extreme limitations, the Court nevertheless agrees with the weight accorded to Dr. Mathias' opinions and the reasoning employed by the ALJ.

Dr. Mathias' treatment notes often contain one to three sentences summarizing her discussion with Plaintiff during each visit, but are typically devoid of any clinical observations, information regarding Plaintiff's mood or affect, or details such as the frequency or severity of Plaintiff's symptoms that would otherwise lend support to her diagnoses. *See, e.g.,* tr. 433–37, 642–43, 645–48, 654–55, 671–72, 679–80. For instance, the ALJ noted that Dr. Mathias diagnosed schizoaffective disorder based upon Plaintiff's allegations of auditory hallucinations, tr. 507, but Dr. Mathias' treatment notes often contain little to no documentation regarding the extent, contents

of, or frequency of the hallucinations. *See, e.g.,* tr. 433–37, 642–43, 645–48, 654–55, 671–72, 679–80. Likewise, Dr. Mathias reported Plaintiff's functional capacity to be markedly and extremely limited based upon her anxiety and concentration, but the treatment notes often provide no detail regarding Plaintiff's struggle with anxiety or maintaining concentration. *Cf., id.;* tr. 444–56, 616–25.

Furthermore, the ALJ's finding—that Dr. Mathias' diagnoses are not supported by Plaintiff's daily activities—is supported by the record. For instance, Dr. Mathias continued to differentially diagnose "panic disorder with agoraphobia," even after Plaintiff told Dr. Mathias that she was going out to eat at crowded restaurants, and was celebrating holidays at her friends and family's house.[6] *Cf.* tr. 432–33; 701–02.

Dr. Mathias' opinion regarding Plaintiff's limitations are also inconsistent with the other medical opinions of the record. For example, Dr. Mathias and Ms. Pritchett reported that Plaintiff had marked limitations in concentration, persistence, and pace, and repeatedly cited Plaintiff's inability to concentrate as a primary reason they believed her to be unemployable. Tr. 617–25. However, Plaintiff's former therapist, Ms. Kennedy, found Plaintiff's memory and concentration to be only mildly impaired. Tr. 333. Dr. McIntosh found Plaintiff's concentration to be fine, tr. 302, as did Dr. Goldsmith, who found Plaintiff's ability to maintain concentration on simple tasks unimpaired and only moderately impaired for tasks of extended duration. Tr. 305–06.

While the ALJ did not give Dr. Mathias' opinion controlling weight on her opinion

---

6. "Agoraphobia" is defined as an "irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided." STEDMAN'S MEDICAL DICTIONARY, 27th Edition A–10590 (Lippincott, Williams & Wilkins 2000).

of Plaintiff's employability, he did accord "some deference" to her opinion regarding Plaintiff's social and stress restrictions in determining the RFC. Tr. 507. The Court finds this level of deference to be supported by substantial evidence.

■ Regarding the opinion of Plaintiff's primary care physician, Dr. Fronista–Ward, the ALJ found that her opinion was similarly entitled to less than controlling weight for a number of reasons. The ALJ noted that Dr. Fronista–Ward is not a mental health specialist; her diagnosis of agoraphobia is not consistent with Plaintiff's reported daily activities; and her "mental assessment is not clearly indicative of disability." Tr. 507. Furthermore, Dr. Fronista–Ward's treatment of Plaintiff ended in August 2006. *Id.* The ALJ's analysis in this regard is found supported by substantial evidence.

In Dr. Fronista–Ward's September 2006 interrogatories to the SSA, she opined that Plaintiff would be unable to complete a normal workday, maintain regular attendance, demonstrate reliability, and withstand the pressure of meeting workplace productivity standards because of agoraphobia and anxiety. Tr. 353–58. However, given the evidence in the record, the ALJ reasonably found that "[Plaintiff]'s reports of daily activities in this record are not consistent with true agoraphobia." Tr. 507. For example, Plaintiff testified at both hearings that she socializes with friends and relatives at her residence. Tr. 479, 816. Plaintiff reported to Dr. McIntosh that she enjoyed playing card games with another couple. Tr. 302. Furthermore, Plaintiff told Dr. Halmi that she will go places with friends and family if they drive; that she will go out to eat; and that she has no problems getting along with people. Tr. 722. Based upon these and other evidence of Plaintiff's daily activities, the ALJ's weighing of Dr. Fronista–Ward's assessment, based upon her diag-

nosis of agoraphobia, is reasonable and supported by substantial evidence.

Similar to Dr. Mathias' treatment notes, Dr. Fronista–Ward's notes—which are generally devoid of clinical observations and details regarding the severity and frequency of Plaintiff's symptoms—do not support her assessments regarding Plaintiff's ability to function in the workplace. *See, e.g.,* tr. 216–30, 360–69. The notes include references to depression and her prescriptions for anti-depressants over a number of years. However, Plaintiff herself acknowledged that her depression was well-controlled by medication at the hearing before the ALJ on February 20, 2007—which took place more than six months after Plaintiff stopped seeing Dr. Fronista–Ward. Tr. 471–72. Although Plaintiff argues that Dr. Fronista–Ward is entitled to the controlling weight of a treating physician because she treated Plaintiff with anti-depressant medication until August 2006, based upon the foregoing, the Court finds that the ALJ did not err in the level of deference he ultimately accorded to Dr. Fronista–Ward's opinion.

Regarding Plaintiff's treating neurologist, Dr. White, the ALJ accorded "no significant weight [ ] to his assessments, which often suggest ability to do sedentary work anyway, which is the residual functional capacity." Tr. 510. The ALJ explained that Dr. White only treated Plaintiff for seizure control and headaches—and for no other physical or mental impairments. Tr. 509. The ALJ found "[n]othing in his assessments indicates that she is disabled or limited seriously in [her] ability to work due to either the seizure condition or headaches." Tr. 509–10.

■ The Court finds that the ALJ did not err in the weight he accorded to Dr. White's opinions. The two conditions for which Dr. White provided treatment were not disabling. Although the precise date

is unclear, the record shows that Plaintiff's seizures were well-controlled by medication by at least March 2004. *See* tr. 245. As for Plaintiff's migraine headaches, Dr. White acknowledged in a November 2005 letter to Plaintiff's counsel that the headaches themselves were not disabling. Tr. 342. In the same letter, Dr. White acknowledged his own limitations regarding his opinions of Plaintiff's other ailments, stating that they were outside his "area of expertise." *Id.* He also commented in that letter that if Plaintiff were to work at all, "she would require a sedentary job." *Id.* Dr. White found that Plaintiff's physical ability to sit for an eight-hour workday was not impacted by her impairments, nor was her ability to stand/walk or occasionally lift up to twenty pounds, tr. 629, which supported his opinion regarding Plaintiff's ability to perform a sedentary job.

However, a short time later, Dr. White opined that Plaintiff was "unemployable" because of arthritis and lower back pain. Tr. 575. He also opined that she was unable to work even at a light or sedentary job because of her depression and anxiety. Tr. 626–33.

The ALJ appropriately noted that the functional limitations recommended by Dr. White are accommodated with the RFC as adopted in his decision, and by the restriction that Plaintiff only perform sedentary work. Furthermore, Dr. White's opinion is, as he himself acknowledged, beyond his "area of expertise" and is based upon seeing Plaintiff only once or twice per year. Consequently, the ALJ's decision—to accord less than controlling weight to Dr. White's opinion—is supportable by SSA regulations, as well as the record. The Court finds that the level of deference accorded by the ALJ to Dr. White is reasonably supported by substantial evidence.

While Plaintiff maintains that the state's reviewing and consultative medical sources were improperly favored over the treating medical sources, a plain reading of the ALJ's decision finds this assertion to be untrue. The ALJ acknowledged that he did not completely defer to the state's consultative medical sources, which tended to favor an RFC of "light work," but instead "gave [Plaintiff] substantial benefit of the doubt on the issue of limitations to the extent of sedentary work, thus giving little weight to the BDD assessment and somewhat greater weight to the assessments by Dr. White and Dr. Bhat (which assessments, though equivocal at times, tended to support sedentary work)." Tr. 510.

The Court has thoroughly examined and considered Plaintiff's other arguments, but finds them to be unpersuasive. Moreover, as repeatedly noted throughout the ALJ's decision, credibility played a significant role in the ALJ's analysis of this case. In light of the extensive discussion throughout this Opinion, the Court finds that the ALJ's credibility determinations are supported by substantial evidence, and should be upheld.

 The Sixth Circuit has long held that an ALJ's findings concerning the credibility of a claimant's testimony about her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997). Accordingly, an ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir.2001). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir.2003); *see also Smith v. Chater,* 99 F.3d 780, 781 (6th

Cir.1996) (holding that the ALJ was not obligated to fully credit the claimant's allegations of disabling pain when claimant was not credible).

■ The ALJ found Plaintiff's statements—concerning the intensity, persistence, and limiting effects of her symptoms—not to be credible to the extent they are inconsistent with her RFC. In support of his credibility determination, the ALJ cited Plaintiff's inconsistent testimony regarding her explanation of why she stopped working in January 2004. Tr. 510. Plaintiff testified at the first administrative hearing that she was terminated from her job in 2004 due to a complaint. Tr. 468. In February 2010, she told Dr. Halmi that she was fired from her job as a cashier because of a cash shortage, but claimed that she was "set up." Tr. 721. However, at the second administrative hearing, she testified that she stopped working in 2004 because she had a nervous breakdown. Tr. 803. In addition, as discussed at length *supra*, the record revealed a number of inconsistencies between Plaintiff's daily activities, the diagnoses of Plaintiff's medical sources, and her alleged disabilities. Moreover, the ALJ also cited to other inconsistencies Plaintiff presented to Dr. Halmi, including her poor scores on IQ testing, which did appear valid in light of her educational background. Tr. 511.

Based upon Plaintiff's daily activities and Plaintiff's testimony about the extent of her pain and limitations, the Court finds that it was permissible for the ALJ to discredit Plaintiff's testimony about the severity of her symptoms and her functional limitations. The Sixth Circuit has opined that, "[t]he absence of sufficient objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis." *Walters*, 127 F.3d at 531. Here, the ALJ's determination of Plaintiff's credibility is entitled to great weight and deference, and should not be disturbed by the Court.

■ In summation, the Court finds that the functional limitations resulting from Plaintiff's mental and physical impairments are adequately addressed by her RFC. Although a number of Plaintiff's medical sources opined that Plaintiff is completely disabled based upon a myriad of reasons, the Court finds that the ALJ sufficiently analyzed each medical source, appropriately weighed each source in accordance with SSA regulations, intelligibly presented his reasoning underlying the level of deference he accorded to each source, and acted within his "zone of choice" given the evidence contained in the record. As such, the ALJ's determination—that Plaintiff was not disabled between January 16, 2004 and January 13, 2009—should be found supported by substantial evidence and affirmed.

## IV. RECOMMENDATION

For the foregoing reasons, the Court finds Plaintiff's assignment of error without merit. **IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's determination that Plaintiff was not disabled prior to January 14, 2009 be **AFFIRMED;** and

2. The case be **TERMINATED** on the docket of this Court.

December 16, 2011